# MARCH TERM, 1848.

GEORGE EBERLE vs. THE BOARD OF PRESIDENT AND DIRECTORS OF THE ST. LOUIS PUBLIC SCHOOLS.

1. The survey of the out-boundary of the town of St. Louis, made in pursuance of the act of Congress of 13th June, 1812, is *prima facie* evidence of title in the St. Louis Public Schools to the land within said boundary designated and set apart by the Surveyor General of Illinois and Missouri for the use of such schools.

2. It is however not conclusive, and may be rebutted by evidence, that a certain parcel of land embraced in such survey was neither " a town or village lot, out lot, common field lot, nor part of the commons belonging to such town," but was a vacant piece of ground not belonging to such town.

3. The reservation made by the act of 1812 for the use of schools, includes only the lots in the sense in which they were understood in the enumerated towns and villages; and whether a certain piece of land is such a lot is a mixed question of law and fact.

4. In a suit in which a town is a party interested, the citizens of such town are not competent jurors.

## ERROR to St. Louis Circuit Court.

### *Statement of the Case.*

This was an action of ejectment tried in the Circuit Court of St. Louis county in January, 1847. The plaintiffs below and defendants in error claimed to recover lot —— in Evans' and Langham's addition to the city of St. Louis, lying south of Mill creek and now within the limits of the city.

On the trial of the cause, and when the jury was called, seven of the jury being residents and householders in the city of St. Louis, were objected to as incompetent to sit upon the trial of the cause. The objection was overruled and the jurors sworn. The plaintiffs below gave in evidence the following documents: 1st, Instructions from the Commissioner of the General Land Office directing certain lands therein mentioned to be surveyed and set apart for the use of schools in the city of St. Louis; 2nd, A survey in pursuance of said instructions. The instructions and survey set apart a tract or parcel of land including the premises in question. The possession of the defendant was admitted. The plaintiffs below gave in evidence a map marked X, purporting to be a plat and description of the survey of the out boundary lines of the town (now city) of St.

Louis, in the Territory, now State, of Missouri, as it stood incorporated on the 13th June, 1812, including the out-lots, common field lots of the common field of St. Louis, and the common thereto belonging, made in pursuance of the first section of the act of Congress approved the 13th of June, 1812, entitled "An act making further provision for settling the claims to land in the Territory of Missouri."

This evidence was objected to for reasons which appear in the points made by the plaintiff in error. The defendants below then gave in evidence the following order of the Court of Common Pleas for the county of St. Louis: "In the Court of Common Pleas, November Term, 1809.—On petition of sundry inhabitants of the town of St. Louis praying so much of said town as is included within the following limits to be incorporated, to wit: Beginning at Antoine Roy's mill on the bank of the Mississippi, thence running sixty arpents west, thence south on said line of sixty arpents in the rear until the same comes to the Barrier des Noyer, thence due south until it comes to the Sugar Loaf, thence due east to the Mississippi, from thence by the Mississippi to the place first mentioned. The court having examined the said petition, and finding the same is signed by two-thirds of the taxable inhabitants residing in said town, order the same to be incorporated, and the metes and bounds to be surveyed and marked, and a plat thereof filed of record in the clerk's office, and David Delawney and William C. Carr are appointed commissioners to superintend the first election of five trustees in pursuance of the law."

This evidence was also objected to for reasons stated in the points of plaintiff in error.

The plaintiff below proved the monthly value of the premises, and rested.

The defendant below gave in evidence the receipt of the Receiver of the Land Office at St. Louis, dated 2nd May, 1836, acknowledging the receipt of forty-four dollars and thirty-six cents, being in full payment for the fractional section No. 26, in township No. 45, of range No. 7, east, containing thirty-five 49-100 acres, at $1 25 per acre. This was objected to by counsel for plaintiffs below. The defendants also offered in evidence a copy of an *entry* made in the books of the Receiver at St. Louis, duly certified to be a copy by the Receiver, and which is as follows: "May 2nd, 1836; Pre-em. acts of 1814 and 1816; Receipt No. 6848; Robert Duncan, St. Louis, Mo.; Fractional section 26, township 45, range 7 east, containing 35 and 49-100 acres; 44 dollars and 36 cents." This evidence was objected to and excluded. The defendant below then deduced a title from Robert Duncan to himself for the premises in question. A copy of an old map, known as Chouteau's map, and found in the office of recorder of land titles, was offered in evidence and objected to. The original was afterwards produced, and on objection being made, was excluded. There was evidence given tending to prove the map was adopted by the Government, and it purported to be made in 1780, and to represent St. Louis as fortified by Lt. Governor Crozat.

There was evidence to prove that the actual limits of the town were north of the creek called Mill creek, in 1812, by several witnesses. An ordinance of the trustees of the village, made in 1811, defining the boundaries, was also read in evidence after objection, and also proof of its publication in the Louisiana Gazette. It was also proved by the assessor's and other offices that the municipal jurisdiction was confined to the boundaries stated in said ordinance.

William Milburn, Surveyor General, who constructed the map given in evidence by plaintiffs below, testified said map was compiled from surveys made by Brown in 1817 and 1818, and up to 1820; that the line of the corporation, as marked on the map, was first run in 1820. The witness made no survey except a portion of one line; all the surveys had been made, as before stated, by Brown, except survey of commons in 1832, and completed on or before 1820. There never was any survey of out-lots to the knowledge of witness. There were surveys of commons, common field lots, and of the village.

The defendant below gave in evidence certified copy of map of town 45, north of base line, range 7 east, in which is St. Louis; also copies of map of Ste. Genevieve and New Bourbon, from office of Surveyor General; map being an outline sketch of St. Louis common fields and commons, constructed from maps and surveys from office of Surveyor General; a map of the old town, constructed partly from Chouteau's map and from actual survey. Certified copies of the

following plats from Surveyor General's office, were given in evidence: Plat of common fields of St. Louis; plat of Grand Prairie common fields, and of common fields of Prairie Des Noyer.— Field notes of these surveys, aad of survey No. 3248, and copy of contract between William Rector and Joseph Brown for making the surveys therein named, all objected to as irrelevant.

Assessment roll of the village, made in 1818, offered in evidence, objected to and excluded.

It was agreed either party might read from the State papers.

The plaintiffs below, in reply, produced certified copies of the confirmation to Susan Dubreuil under Sylvester Sarpy. Objected to, and objection sustained.

Instructions were asked by the plaintiffs below, and the following, as asked, were given, except the third:

*First.* The official survey given in evidence by the plaintiff, purporting to be a survey made in pursuance of the act of Congress of the 13th June, 1812, is *prima facie* evidence of the out boundary lines of the town of St. Louis, surveyed so as to include the out lots, common field lots and commons thereto belonging.

*Second.* If the jury find from the testimony that the lot or parcel of land designated by the survey No. 367, as given in evidence in this case, is within the out boundary lines of the town of St. Louis, surveyed so as to include the out lots, common field lots, and commons thereto belonging, and that before the commencement of this suit, the Surveyor of the United States for the States of Illinois and Missouri, under the instruction of the Commissioner of the General Land Office, did survey, designate and set apart to the said town, the said lot, for the use of schools therein, and that the land in dispute is within the said survey No. 367, then the plaintiff has shown sufficient title to the land in dispute.

*Third.* If the jury believe from the testimony that the town of St. Louis was incorporated in the year 1809, and stood so incorporated at the date of the act of June 13th, 1812, with boundaries such as to include the lots in dispute in this action, then the said lot in dispute is property included within the out boundary lines of the town of St. Louis, as exhibited on the map given in evidence, marked X.

*Fourth.* If the jury believe from the testimony that the lot in dispute is within the out boundary lines of the town of St. Louis, as the same existed at the date of the act of Congress of June 13, 1812, then the receipt of the Receiver of Public *Moneys*, given in evidence by the defendant to show title in Robert Duncan to the land in the receipt mentioned, is not any evidence of title in Duncan, or any claiming under him, as against the plaintiff.

The court also gave the following instruction:

If the lot or tract of land in question is within the survey designated by the witnesses as the out boundary line of St. Louis, as run and as shown by plat X, then the plaintiff is entitled to recover in this action.

The defendant asked the following instructions, all of which were refused:

*First.* If the jury believe the surveys were made by Brown under the Government in 1817 and 1818, of the outer boundaries of St. Louis and of the common fields, and that the commons had been before surveyed according to law, no new surveys or plats could be made by any one subsequently discharging the duties of the office of Surveyor General, without authority of law, especially after a lapse of twenty years; and that any map compiled partly from such previous surveys, and in part from any new or additional survey, cannot be evidence of the survey authorized by the act aforesaid.

*Second.* If the jury believe the surveys mentioned in the first instruction were made under the act of Congress of June 13th, 1812, and plats thereof made, and surveys approved by the proper persons then in office, no new surveys or plats could be made by any one subsequently discharging the duties of the office of Surveyor General, without authority of law, especially after a lapse of twenty years; and that any map compiled partly from such previous surveys, and in part from any new or additional survey, cannot be evidence of the survey authorized by the act aforesaid.

*Third.* The map X is not evidence of any thing unsupported by any evidence of actual surveys by any one—the surveys from which it was constructed not being in evidence.

*Fourth.* If the jury believe the premises in question are not within the town or village of St. Louis, as it existed in 1812, or within the common fields or commons, they should find for the defendant.

*Fifth.* The act of Congress of 13th June, 1812, does not reserve for the use of schools in the towns and villages therein mentioned, any land which had not been designated as a village lot, out lot, or common field lot, and if the jury believe the premises in question were, at the date of the act aforesaid, and always had been a part of a vacant and unappropriated piece of ground, they should find for the defendant.

*Sixth.* The act of Congress of the 13th dune, 1812, did not require a continuous boundary which should include the town, common fields, out lots and commons, where either was separated from the other by intervening tracts; and if the jury believe the town, common fields, out lots and commons of St. Louis were either of them so separated from the other, then the act required separate surveys and plats of each, and no land was reserved for the use of schools except that not otherwise owned or claimed by private individuals, or held as commons within such separate and distinct surveys and plats.

*Seventh.* If a continuous boundary is required by the act of June 13th, 1812, then the exterior lines of such boundary must be in reference to St. Louis, in part the south-east exterior lines of the commons; and if the jury believe the town of St. Louis did not extend, at the date of said act, further south than the creek called Chouteau's Mill creek, and which is the outlet of Chouteau's pond, then the lines of the commons extended to the south boundary of the town, could not include the premises in question, and the defendant is entitled to a verdict.

*Eighth.* If the jury believe from the evidence that the land sued for in this action was not a town lot, village lot, or common field lot, at the time the American Government took possession of Upper Louisiana, they will find for the defendant.

*Ninth.* If the jury find from the evidence that the land sued for in this action was not, nor any part thereof, either a town lot, village lot, out lot, or common field lot, on the 20th Dec'r, 1803, they will find for the defendant.

*Tenth.* If the jury find from the evidence that the land embraced in this suit was beyond the limits of the town of St. Louis, as said town existed under the French and Spanish Governments, and that on the 13th June, 1812, it was not any part of the land inhabited, used, or laid out for the purposes of said town or its inhabitants, they will find for the defendant.

*Eleventh.* If the jury believe from the evidence that the land in question was, during the French and Spanish governments, outside of the town of St. Louis, and was, as late as the 13th June, 1812, an unappropriated and vacant space beyond the regular limits of said town, they will find for the defendant.

*Twelfth.* That the act of Congress of the 13th June, 1812, entitled "An act making further provision for settling the claims to land in the Territory of Missouri," does not reserve for the use of schools in the towns and villages therein mentioned, any land which had not been made a town or village lot, out lot, or common field lot, previously and by proper authority.

*Thirteenth.* If the jury find from the evidence that the survey of the out boundary line of the town of St. Louis under the act of June 13th, 1812, could have been so run as to include the out lots, common field lots, and commons thereto belonging, and exclude the land in this action sued for, they will find for the defendant.

*Fourteenth.* If the jury find from the evidence that the land in question, before and on the 13th June, 1812, was a vacant space not embraced within the streets of St. Louis, nor included among the regular lots of the village, and that it had never been a common field lot, then the said act of Congress did not reserve it for the support of schools.

*Fifteenth.* If the jury find from the evidence that the out boundary line of the survey of St. Louis, given in evidence by the plaintiff, does not include all the common field lots belonging to St. Louis, then the same line has been illegally run, and is not evidence of title.

*Sixteenth.* The boundary line of St. Louis, of the lots and commons thereof, has not been run according to law, and is not any evidence of title.

*Seventeenth.* That the town or village lots, out lots, and common field lots, reserved for the use of schools by the act of 13th June, 1812, and relinquished by the act of 29th January, 1831, to the inhabitants of the several villages therein mentioned, was a reservation to the villages as they were under the French and Spanish Governments; and the act of the Legislature incorporating the plaintiffs to be elected by the inhabitants of the city of St. Louis as it stood incorporated at the passage of said act, is ineffectual to divert the trust fund from the ancient inhabitants of the village of St. Louis to the modern city of St. Louis, and the authority in the act authorizing the election of the board of directors by other than the grantees, is null and void, and the plaintiffs cannot maintain this action.

*Eighteenth.* Congress, when they passed the act of 1812, were legislating about the Spanish towns as they existed before the change of government, and about claims under the Spanish Government; and the plaintiff cannot recover in this case unless the jury find from the evidence that the land in question was included within the limits of the town of St. Louis as it existed in 1803 at and prior to the time when the the United States took possession of the territory now included within this State, or was within the commons or common fields adjacent to said town.

*Nineteenth.* The pre-emption to Robert Duncan conferred a valid claim under the pre-emption laws, and he having settled on the land before any survey thereof was actually made, is entitled to hold it; and the persons deriving title from said Duncan, have a title superior to the plaintiffs.

Exceptions were taken by the defendant below in due form to the various decisions against him, and to the giving of the instructions which were given, and to the refusal to give those asked by the defendant. The jury found a verdict for the plaintiffs.

The defendant moved for a new trial, for the ordinary reasons, which was refused. A bill of exceptions was sealed and the cause brought up by writ of error.

## HAIGHT & LESLIE, *for Plaintiff in error.*

*First.* Seven of the jurors called and sworn on the trial of this cause, being residents and house-holders of the city of St. Louis, were incompetent to set upon the trial of this cause. This point was made in the case of Trotter vs. the same defendants, but not passed upon by the court, so far as we can judge from the opinions delivered. 9 Mo. R., p. 69. These jurors were members of the corporation and interested to increase the fund.

*Second.* The order of the Court of Common Pleas of the county of St. Louis, set out in the bill of exceptions, was inadmissible, because,

1. There was no evidence, and it was not proposed to give any, of any petition having been presented to the Court of Common Pleas, and this being a pre-requisite to give the court juris-diction, must be proved. Territorial Laws, vol. 1, p. 184; 1 Hill's N. Y. Rep., 131, Bloom vs. Burdick.

2. If the recital in the order is evidence of any petition having been presented, it clearly proves that the one presented was not such as was required by statute. Ter. Laws, vol. 1, p. 184.

3. The order made is not available as evidence of an incorporation, and cannot have the force and effect of a charter prescribing boundaries, because no power was conferred on the Court of Common Pleas to incorporate *ad libitum* or to change or alter in any manner the territory inclu-ded in any town or village. The jurisdiction conferred was merely and simply to ascertain from the people themselves the territory included in fact within their town or village, and that being ascertained, that at least two-thirds of the taxable inhabitants in the territory thus ascertained were willing to accept the incorporation which the statute prescribes for or bestows upon any town or village which should desire it. Ter. Laws, vol. 1, 184, 378, 967, 971, 972; Strachan's Do-mat., 309, 475, sec. 1, tit. 2; sec. 2, art. 14, tit. 15; sec. 1, art. 8; Angel & Ames on Corporations. page 29; Wilcox an Municipal Corporations.

These authorities confirm what is presumed to be generally conceded, that creating a corpora-

tion is an act of the sovereign power of the State and ought not to be delegated, if in a constitutional government it legally can be. For instances of incorporations under general statutes, 3rd vol. N. Y. R., sec. 206, 202, 229, 224; Laws of N. Y. 1841, p. 351, contain what is usually called the general banking law.

4. The order of the court of Common Pleas could not have the force and effect of a judgment and preclude the present defendant on the question of what were the territorial limits of St. Louis, because he was not a party or privy to the proceeding.

*Third.* The court excluded competent and relevant evidence offered by the defendant below and plaintiff in error, viz:—

1. The ancient map of St. Louis, filed in the office of the Recorder of Land Titles. See evidence of Rene Paul, F. R. Conway, State papers, vol. 2.

2. The certificate of the Receiver.

3. The assessment roll of the old town of St. Louis.

*Fourth.* The instruction given by the court "that if the lot or tract in question is within the survey designated by the witnesses as the out boundary line of St. Louis as run and as shown by plat X, then the plaintiff (below) is entitled to recover against the defendant (below) in this action," was erroneous, because,

1. The plat was not the result of any survey—was not made in pursuance of the act of Congress of 13th June, 1812, and was not evidence *prima facie.*

2. If made, or attempted to be made, in compliance with section 1 of the act of June 13, 1812, it is erroneous in assuming that the corporarion line, as ordered by the Court of Common Pleas in 1809, defines the boundaries of the village or town of St. Louis, referred to in the act of Congress last mentioned.

*Fifth.* If the plat or survey X is made upon erroneous data, there is no evidence before the court which can enable them to say that the premises in question are within any boundary properly run in pursuance of the act of 1812.

*Sixth.* Sec. 1 of the act of June 13, 1812, in directing a survey of the out boundary lines of the said several towns and villages, so as to include the out lots, common field lots and commons thereto respectively belonging, does not require a continuous boundary where there are intervening tracts separating the towns from the commons and common fields. In such, the construction becomes impracticable, and the surveys are to be separate and distinct. Such was the practical construction in relation to St. Louis. All the surveys were completed without attempting any boundary of this kind until about twenty-eight years after the law passed.

*Seventh.* The pre-emption of Robert Duncan conferred a valid claim under the pre-emption laws, and he having settled before any survey thereof was actually made, was entitled to hold it, and the persons deriving title from him have a title superior to the plaintiffs below. Duncan went on to the land in 1819, under the acts of 1814 and 1816, and perfected his claim by payment in 1836.

### BATES, *for Defendant in error.*

The title of the school board to the land in question, as against the United States and those claiming under the U. S., is precisely the same as the title set up by the same party in the cases against Hammond and against Trotter; and for the particulars of that title, I refer to my brief published in the first named case.

As to the survey.

1. The act of the surveyor in running the out boundary of the town of St. Louis, is the act of the United States, made in pursuance of the law of 13th June, 1812; and no person can be heard to question the regularity of the survey, unless he can show that it interferes with some right of his, older than that law. Hunter vs. Hemphill, 6 Mo. R., 118; Trotter vs. Public Schools, 9 Mo. R., 69.

This does not interfere with the right of the U. S. to make an absolute grant of land within or without the boundary, at any time before the passage of the act of Congress of 27th January, 1831, (which relinquished the entire title) as was in fact done by the confirmation to Madam Laquaisse. (See Hammond's case.)

2. If the survey of the out boundary were open to question, still it could in no manner be affected by the act of the court incorporating a part of the town of St. Louis in 1809, nor by any designation of boundaries therein, nor by any act done under authority thereof, for the plain reason that the act of Congress of 1812 required the survey to be made, not by authority of the town of St. Louis or the Territory of Missouri, but by its own authority and its own officer. That officer's surveys of public lands are conclusive upon private parties. 8 Mo. R., 553.

All towns mentioned in the act of 1812, as well as St. Louis, were to be surveyed in their out boundaries by the same surveyor, whether they had or had not been previously incorporated or surveyed, by some authority, for municipal or personal convenience.

3. In like manner, the act of surveying, designating and setting apart the land in question for the support of schools, is the act of the United States, done in pursuance of its own laws; and no person can be heard to question the regularity and propriety of the proceeding unless he can show that it interferes with his prior right.

*Note.*—The assignment of the particular lot cannot be made but upon the direction of the Commissioner of the General Land Office, after the return of the survey of the out boundary, and after the President has waived the reservation for military purposes. And so, both the Commissioner and the President must have known and approved of the out boundary survey.

4. The act of Congress of 1831 relinquishes all right and title to the land, and gives to the Legislature of Missouri the power to make particular disposition of it, and the charter of the board (13th Feb'y, 1833) vests the right. Then the assignment of the particular lot vests the title thereof, as fully as a patent could do. And the patent, or other final evidence of title, assumes the correctness of all previous steps. None but the Government can question it, and then only by a direct proceeding to annul the title.

5. If the survey of the out boundary be right in itself, or, what is the same thing, not impeachable, then, beyond all doubt, the title of the plaintiff below was perfect, by the actual assignment of the land. For, all within the out boundary is reserved from sale by the act of 1812, and the act under which Duncan claimed pre-emption, (5th Feb., 1813—12th April, 1814) forbids the entry of lands reserved from sale by former acts.

6. Duncan, on the contrary, has no right at all, by his entry in 1836—because,

*First,* There was, from 27th January, 1831, a perfect title against him, passed from his grantor by that act.

*Second.* The land being reserved from sale by the Government, the Register and Receiver having no power to sell at all, of course had no power to act upon or allow a pre-emption. 13 Pet. R., Wilcox vs. McConnell's lessee.

*Third.* The record does not show that any pre-emption was in fact allowed or even claimed by Duncan under the law, and the proof negatives his right to a pre-emption.

7. Besides, Duncan never applied to purchase the land till 1836, whereas, if he claimed a pre-emption at all, the act under which he must have claimed is the Illinois pre-emption law of 1813, and that required, under pain of forfeiture, that the claim should be made in writing to the Register two weeks before the time of the commencement of the public sales, *in the District*—not the township nor the section, but the *District.* And in point of fact, this very township (45, N.) was surveyed, and the public sales in the District commenced, as early as 1818.

8. Again, the act of Congress of March 3rd, 1819, could not help Duncan to his pre-emption, (even supposing the truth of all the facts in his favor required by the acts of 1813 and '14) because the act obviously applies to country lands, and not to towns. The lands mentioned therein as reserved for the use of schools, mean the 16th sections and the seminary lands, reserved by sec. 10 of act 3rd March, 1811, and sec. 3 of act 17th Feb., 1818. Nor can he derive any aid from the act of July 2nd, 1836, sec. 2, as claimed here, because that law has no relation to the case.

*Note.*—Even those country lands could not be so entered after 1820, because, by selemn contract, the State purchased them from the U. S. for a valuable consideration. See act of Congress 6th March, 1820, sec. 6, and the ordinance of the Missouri Convention accepting the propositions of Congress.

9. ·Either Eberle was a mere trespasser on the land, or he claims title to it by a purchase from the U. S. in May, 1836, as evidenced by the receipt of the Receiver in the record. *As a trespasser*, he is not in a condition to question any of the official acts by which the school board claim the title: *as a purchaser* from the U. S., he is bound by all the previous acts of his grantor conferring the title on the school board.

10. In regard to the term *out lots*, it has been called a novel phrase, occurring only in the act of 1812, and with no useful meaning attached to it. This is a mistake. Besides the act of 1812 and the many confirmations of irregular tracts and common field lots, (dozens, perhaps hundreds of which may be fonnd in the 2nd and 3rd volumes of public documents referred to in this record,) the term is familiar both in our legislation and in the instructions and letters of our administrative land offices. The act of 3rd March, 1803, sec. 12, excepts from sale the *out lots* of Natchez—an old French town. The act of 30th April, 1810, sec. 6, actually provides for the making of *out lots* at Shawneetown. And the pre-emption act of 5th Feb., 1813, sec. 1, reserves from entry *out lots* by name.

### GEYER, *on the same side.*

1. The act of Congress of 13th June, 1812, disposes of all lands within the out boundaries of the town of St. Louis, so surveyed as to include all out lots, common field lots and commons thereto belonging. The first section granting to individuals all lots which had been inhabited, cultivated or possessed prior to the 20th December, 1803, and to the inhabitants collectively the commons. The second, reserving to the use of schools, or for military purposes, all vacant lands within the out boundaries to be surveyed. Both sections operate to the whole extent of the survey, when made, and only within it. The grants to individuals, as well as the reservations, were to be effected by the survey. It belonged to the grantors either to define the limits or appoint the mode in which they should be ascertained, and when defined or ascertained by the appointed means, all persons not having title paramount to that of the grantors, are concluded by it. The surveyor is the appointed agent of the United States to ascertain the boundary, and his act is just as obligatory upon all persons as would be an act of Congress defining the boundaries. Both are agents, not proprietors, and the acts of each, within the scope of their authority, is equally binding. Doubtless, Congress might grant to individuals any portion of the reserved land prior to 1831, but, in that case, there would be no question about the out boundary, because the title would be paramount, whether the land granted was within or without the out boundary; but if the location of the grant depended upon the out boundary, the grantee would be bound by the survey when made. It is so in all cases where there is a grant or confirmation, the boundaries of which are to be ascertained by official survey. Boyce vs Papin, 11 Mo. R.; Campbell vs. Clark, 8 Mo. R., 553.

2. The several acts of Congress of 1812, 1824 and 1831, operate as a legislative grant, and appoint as the only and final evidences of title, a survey, designation and setting apart the land in question to the use of schools. These evidences are of as high a nature and as conclusive as a patent for lands under the general law, vesting a legal title, which must prevail in a court of law against any equitable incomplete or inchoate title (the most that the defendant can claim) originating since 1812—and especially against such claim originating since 27th January, 1831. As between these parties, therefore, the evidences of title in the plaintiffs below are conclusive, and the survey of the out boundaries is in no wise material. The grant to the plaintiffs below being made and completed, and the boundaries of the particular lot established, the defendant below could not suc-

cessfully defend his possession except by showing a complete title older than that of the plaintiffs in himself or another.

3. The act of the commissioner and surveyor, in designating, surveying and setting apart the land in question, is not only conclusive of title, but, like a patent, is conclusive evidence that the previous steps have been taken according to law; and moreover, being acts performed by the agents of the United States, in that behalf authorized, is a confirmation of the survey of the out boundaries.

4. The survey, if not absolutely conclusive as against all the world, is at least conclusive against the defendant below, who is not in a condition to dispute the survey. The title set up by him is confessedly incomplete, originating in a purchase from the Register and Receiver five years after the United States had divested themselves of all interest by the act of 27th January, 1831. It has no lawful origin, and could not, under the laws of the United States, be perfected into a complete title. The land was not subject to sale or entry at any time since the 13th June, 1812—certainly not after the 27th January, 1831. Even if Duncan had (as he had not) a right of pre-emption, as it is called, and the land had been subject to sale, he could not, in 1836, acquire the land by purchase from, or entry with, the Register and Receiver, because, at that time, the U. S. had no title in the land, and the Register and Receiver no authority to sell it—so that no title, complete or incomplete, legal or equitable, passed to Duncan; and the defendant, claiming under him, must be regarded as a mere trespasser who cannot dispute the acts of the officers of the United States. He is in no better condition than the appellant in the case of Trotter, who attempted to dispute the same survey under cover of a New Madrid location made in 1817, and was treated by this court as a trespasser.

5. Whether the defendant below is or is not in a condition to dispute the survey, it is at least *prima facie* evidence, and until it is impeached by competent testimony, must be regarded by all courts as a compliance with the first section of the act of 13th June, 1812, embracing all required to be included and no more. It does not devolve on the plaintiffs below to prove the correctness of the general survey, by the production of the surveys and field notes of the particular lots included, or otherwise. If it can be impeached, it must be by the production of evidence by the party who disputes it—and that evidence is not to be found in the opinions of witnesses, who obviously have not the means of judging, and in whose opinions neither the grantors nor grantees have referred the matter. Whether a particular tract included ought or ought not to have been included, depends upon the question whether it is or is not a part of the town—an out lot, or common field lot, or a part of the commons—and this question can be solved only by reference to the grants, the records of the Recorder and Surveyor, and, in some instances, to oral evidence; and the decision of the question upon that evidence, belongs to the court, not to the jury, and still less to a witness who it is attempted to erect into a judge, and require him to decide without evidence against the act of an officer appointed by law to perform the act with all the necessary evidences under his control.

6. There is nothing in the general survey, or in the manner in which the Surveyor performed his dutiy, available to the plaintiff in error. The fact that the plat was in part compiled from the official surveys of the lots and commons required to be included, instead of an impeachment of the general survey, was of indispensible necessity. To make a survey which should include the out lots and common field lots and commons, it was necessary, first, to ascertain by actual survey the locality and boundaries of all the particulars. The exterior boundaries of the outer lots and commons necessarily formed a part of the boundaries of the general survey. They had been surveyed, and, by the terms of the law, were not to be surveyed again. All that the law required was to survey and mark the connecting lines, and that was done.

7. The act of 13th June, 1812, did not require the Surveyor to survey or mark the out boundaries of the village, or the common fields or commons, except so far as they would form a part of the general survey, and not then if they had been previously surveyed. He was required to make but one survey of out boundaries, and that of the town so as to include in that one survey all out

**17**

lots, common field lots and commons. If he had made more than one survey, each one would have excluded some one class of lots or tract of land which he was required to include in the only survey he was authorized to make.

8. There is no evidence tending to prove that any one lot lying south of Mill creek and east of the commons, and included within the survey, was not an out lot or common field lot, so as to require all east of the commons south of the creek to be excluded, as it is contended for by the plaintiff in error. The *prima facie* evidence furnished by the act of the Surveyor, therefore, remains unaffected. That Mr. Milburn, the witness, supposed that the town of St. Louis, as incorporated in 1809, must be included, and gives that as one reason why he extended the general survey to the river, is no impeachment of his official act as Surveyor, nor does it weaken the force of the evidence furnished by the survey made and returned by him under his official oath.

9. No survey made in conformity with the first section of the act of 1812, would exclude any part of the lot in dispute. Beyond controversy, the act requires that the whole town should be included, and not merely the village lots, as one of the particulars. It is the town, in its legal acceptation, and not merely that part of it covered by village lots. The only boundaries of the town known in 1812, were those defined by the act of incorporation. If that was the town intended by the act, it is clear that the lot in dispute was within it and must be included in the general survey; but if it shall be held that the town, as it was previous to the incorporation, was intended, the lot in question must still be included, because the town, under the Spanish Government, was not limited by the village lots, but included the out lots, common field lots and commons. This appears partly by the record, since only a part of the town was included in the corporate boundaries in 1809, partly by the act of Congress, which obviously intends something more than the village lots. The survey is of the town—but of the town so as to include out lots, &c.—conclusively by the Spanish laws and regulations, a translation of which is furnished in the case of Strother vs. Lucas, 12 Peters; and finally, the survey must include all out lots—that is, lots granted to or possessed by inhabitants of the town lying beyond the village lots, and not occupied as village lots. All common field lots—that is, all lots used or cultivated as such—for none were granted *eo nomine*—and the commons. In other words, the survey must include all lots granted to, possessed or cultivated by inhabitants of the village as such—all comprehended in the term "belonging to the town," and all by the Spanish law within the municipal jurisdiction of the town as appertaining thereto.

10. The grant was made for the benefit of the inhabitants of the town, as directed to be surveyed—that is, all the inhabitants then and future within the out boundaries, comprehending all of the now city, and more; but whether the town contemplated was of greater or less extent, is immaterial to the question of the right of the plaintiffs below to recover the granted lots. The power to provide for the control and disposition of them was vested in the State Legislature, and that power was rightfully exercised in the act incorporating the plaintiffs.

11. The objections to the proceedings of the Court of Common Pleas are untenable. This court is not to exercise appellate power over the acts of the court in 1809; and still less are the acts of that court to be rejected by the application of common law tests, or the opinions of courts in New York, seeing that the English common law was not introduced until six years afterwards, and the laws of New York never. The court was competent to grant the order of incorporation and to fix the boundaries—of which the order was the evidence, and the only evidence. It was pertinent to the ascertainment of a fact material to the determination understandingly by the court, of the question proper to be decided.

12. The private map made by Mr. Chouteau, is of no more authority than a diagram made by any other person. He was not the founder of the town, and did not act or profess to act in any official capacity. Although filed in the Recorder's office, it was not for that reason authentic, and was properly excluded. Story's Laws U. S., vol. 2, p. 1257; vol. 3, p. 1973; vol. 4, p. 2220; Trotter's case, 9 Mo. R., p. 69; Wilcox vs. Connell's lessee, 13 Peters, 498; Boyce vs. Papin, 11 Mo. R.; Hunter vs. Hemphill, 6 Mo. R., 106.

Scott, *Judge.*

In the case of Trotter against the Public Schools of St. Louis, I assented to the affirmance of the judgment of the inferior court, because it appeared to me then that all the lands not rightfully claimed by individuals or held as commons, included in the out boundary of the general survey directed by the first section of the act of 13th June, 1812, were reserved for the use of schools. It seemed to me that the survey contemplated by the act was the only mode of ascertaining the lands that were reserved. The question was one abounding in difficulties, and an accurate knowledge of the extent of the town of St. Louis and the quantity of land not owned by individuals nor held as commons included in the survey, were necessary in order to arrive at a just conclusion as to the extent of the reservation intended by the act of Congress.

The question in this case involved was at one time of little importance, and by timely legislation might have been put at rest at an inconsiderable sacrifice. But delays have been interposed, time has rolled on, and St. Louis has become a wealthy, populous and rapidly increasing city, in which real estate has increased in value greatly beyond the most sanguine expectations of its early inhabitants. Many have invested their all in the purchase and improvement of lots. These considerations should admonish courts to listen with caution to the complaints of those who have long delayed the assertion of their rights. The utility and benevolence of the objects of a claim can have no influence in determining its justice. In a government of laws, it cannot be expedient to sacrifice the rights of the humblest individual of the community for any purpose however grand or benevolent.

There are two parties claiming the same parcel of land under the government of the United States. One claimant asserts that the land was first given to him, therefore the other can have no right to it. It is obvious that this argument is a *petitio principii*, or a begging of the question. The very matter in dispute is whether the land was ever given to him who asserts the prior right. In determining this question, it is necessary to inquire on what principle the general survey of the town is made *prima facie* evidence of the right of one party against the other. That it is an official act, and properly authenticated, are not surely the only requisites to make a document evidence in a cause. If, in a controversy between the plaintiff in this action and the General Government or any other party, it had been determined by the highest tribunal known to the constitution and laws of the United States that the land in contro-

versy was the property of the plaintiff, would that judgment have been any evidence against the present defendant? It is clear that it could not be thus used, because it is *res inter alios acta*. If the judgments of the highest judicial tribunals cannot be used as evidence against those who are no parties to them, on what principle are the acts of a mere ministerial officer, in a one sided proceeding, evidence against those claiming rights under the laws who are strangers to them? Can an instance be produced in which it is allowed to a ministerial officer to affect injuriously the rights of one claiming land under the laws of the United States in a proceeding of which he has no notice and to which he is no party? It is not pretended that any law of Congress confers any such effect on the survey. Congress could never have designed that a ministerial officer should usurp the province of the courts, and determine questions whose sole cognizance belongs to them. The object of the survey directed by the act was obvious. All the lands in the then territory of Louisiana not owned by individuals, belonged to the United States. To them were entrusted its disposition. It was necessary to discriminate private from public property, to enable the Government to discharge the duty confided to it. Surveys were directed to be made as guides to its officers, and these surveys, so far as the Government is concerned, are presumed to be correct. Faith is reposed in them, and officers acting under them in the disposition of the public domain will be justified. But because the Government is willing to confide to its own officers the disposition of its own lands, surely it cannot thence be inferred that it intended that those officers should determine whether lands granted to others were rightfully granted, and thus assume the functions of the courts of the land. In making surveys, the officer acts *ex parte*, and concludes no one except the United States. The question between individual claimants is still to be decided by the courts according to the evidence before them. The earliest opinions of this Court were, I conceive, in accordance with these views. In the case of Vasseur vs. Benton, I Mo. R., 212, 296, the act of 1812 first underwent a discussion, and the court, in speaking of the powers of the Recorder under that act, says, that he (the Recorder) had no authority to enter into an investigation of or decide on the titles of individuals to those town lots, and that any conflicting claims between them to any of these lots, ought to be decided in a due course of law, according to their priority of possession, cultivation, or inhabitation. A contrary construction would be predicated upon the presumption that Congress had the power, or at least that they meant, which we are far from believing, to institute

a tribunal to judge of the private rights and claims of contending individuals; and it would in effect be saying, that the Recorder had the right of judging of those claims, not only between private individuals, but also *between them and the inhabitants at large,* to whom, for the use of schools, all lots not rightfully claimed had been reserved and given. This doctrine, so consonant to principles of law, is not overthrown or impugned by any thing that is said in the case of Janis vs. Gurno, 4 Mo. R., 460, in which it was held that the certificate of the Recorder under the act of 1824, which is supplementary to the act of 1812, confirming a claim to a village lot, gives sufficient title to maintain an ejectment against one not having a better title. It is there said expressly, that the act of Congress did not declare the effect of the certificate, and it was allowed the weight of *prima facie* evidence, because it was enacted by our statute of ejectment, (a statute passed subsequent to the opinion in the case of Vasseur vs. Benton,) that a certificate of confirmation should be a sufficient title whereon to maintain an ejectment against one not having a better title. We have no statute which makes the survey in this case a title sufficient to enable a party to maintain an ejectment on it, consequently, the principle of the case of Janis vs. Gurno, is not applicable. Indeed, had it been otherwise, and had that case been founded on the ground supposed, I would not be disposed to extend it further than respect to authorities obliges me. If the case was followed, it would be solely from a regard to precedent.

If then, in controversies between the St. Louis Public Schools and individuals, relative to lots reserved under the act of 1812 for their use, the survey is not *prima facie* evidence of title in them, it follows, that in such controversies it is a matter of indifference to those claiming adversely to the schools what extent is given to the out boundary of the town, or in what manner its lines are run; it may be made co-extensive with the limits of the State so far as they are interested, as the act of the officer cannot affect their rights and as it is a matter which concerns the general government alone.

The survey then being thrown out of the question, nothing is left to ascertain the extent of the reservation made by the act of 1812, but the words of the act. If Congress intended that all vacant lands within the out boundary of the town should be reserved, the donation was a vague one. It was limited to the 1-20th of the contents of the survey which was directed to be made. No two surveyors would make the survey in the same manner, let one of them be unacquainted how it was made by the other. I do not say that after a survey has been made, you may not

bring other surveyors than him who made it, who will approve it, and say that it is in conformity to the act of Congress. Indeed, it is admitted that the survey that has been made is not such a one as is contemplated by the law making the reservation. It is not as comprehensive as was designed by the act. If the survey as directed by law would include more vacant land than could be reserved, would it not be equitable to make all the holders of the vacant lands contribute to make up the one twentieth part, if not rateably, at least in the order of time they acquired titles from the government, beginning with the latest title?

In passing the act of 1812, Congress looked at the French towns and villages in the then Territory of Louisiana, as they were prior to the 20th December, 1803. If a lot had not been prior to that date rightfully claimed by reason of inhabitation, cultivation or possession, and if rightfully claimed, had been abandoned, the occupation of it in the interval between 1803 and 1812, would have conferred no title on its possessor. It would have been reserved. In order to be reserved, a lot must not have been occupied, cultivated or possessed, or if so, abandoned prior to the 20th December, 1803. That was the day on which the French auuthorities at New Orleans delivered possession of the Territory of Louisiana to the American Government. After that period, it is not pretended that there was any authority in any American tribunal or officer to grant lots in any town or village to its inhabitants. Under the Spanish Government a settlement could only be made on the royal domain with the consent of the proper officer. Intruders were expelled. Regulations existed prescribing the manner of laying off towns, disposing of the lots and granting commons and common field lots. Strother vs. Lucas, 12 Peters.

The term "out lot" used in the act of 1812, it seems, was not known to the early inhabitants of St. Louis. But St. Louis is only one of the towns mentioned in that act. The term was known and understood at Ste. Genevieve, one of the enumerated villages, and Ste. Genevieve at the date of the act, vied in importance with St. Louis and consequently was as apt to be in the mind of the legislator as that city.

Congress was expressly informed that there would be vacancies and "vacant spots" in the general survey, yet they were not in terms reserved. In the construction of a private act of the Legislature, which is nothing more than a grant, we may look at the information before the legislator and the circumstances under which it was passed, in order to enable us to ascertain its meaning.

As Congress intended by the second section of the act of 1812, to re-

serve all town or village lots, out lots, and common field lots not right-fully claimed by individuals, is it not remarkable that the disjunctive conjunction "or" should have been used between the words, out lots, and common field lots, instead of the copulative conjunction "and," un-less we suppose that the term "out lots" in some of the enumerated towns and villages, was applied to common field lots.

Does not the phraseology of the latter part of the second section of the act of 1812, favor the construction I have put upon that act?

If all the vacant lands included in the general survey were reserved, why should it have been enacted, that the whole quantity of land con-tained *in the lots reserved,* should not exceed 1-20th part of the whole lands included in the survey? If the entire quantity of vacant land was intended to be reserved, why not have said, that the quantity of vacant land included in the survey should not exceed 1-20th of its contents?

For these reasons I am of opinion that the reservation made by the act of 1812, included only lots in the sense in which they were understood in the towns and villages enumerated in the act, and that what is a lot is a mixed question of law and fact to be ascertained by a jury under the directions of the court.

As to the constitutional question concerning the power of the Legisla-ture of Missouri to divert the bounty of Congress from its original subjects by the act incorporating the plaintiffs, it may be remarked that there is nothing in the record on which it can be predicated. There is no evi-dence of the diversion of the bounty of Congress from those for whom it was designed. If the act of the 13th February, 1833, incorporating the plaintiffs, is relied on for that purpose, I do not conceive that it contains any such evidence. Nor is the defect remedied by a reference to the act incorporating the city of St. Louis.

The objection to the jurors was a valid one. It is a clear principle that jurors must be *omni exceptione majores,* free from every objection and wholly disinterested. The inclination to relax the rule as to ques-tions of interest as to witnesses, has never been manifested as to jurors. Although the Legislature has made the inhabitants of a county com-petent jurors in suits in which the county is a party, it has not relaxed the rule as to corporations. A regard to convenience dictated this change in the law. The books are full that challenges are allowed when the issue concerns a corporation or city, and they are to make the pannel. Hobart, folio 87, a; 3 Bacon, 756.

NAPTON, *Judge.*

The principal questions in this case relate to the survey of the town of St. Louis, made in 1840 by the Surveyor General, and purporting to be made under the provisions of the act of Congress of 13th June, 1812.— This survey was admitted as evidence by the Circuit Court, and held to be conclusive against the defendant.

My opinion is, that the survey is *prima facie* evidence, but not conclusive.

The act of Congress of June 13, 1812, made it the duty of the principal deputy surveyor, to survey or cause to be surveyed and marked (where the same had not already been done) the out boundary lines of the several towns and villages, enumerated in the act, so as to include the out lots, common field lots and commons, respectively, belonging to each town or village. It then declares that "all town or village lots, out lots, or common field lots, *included in such surveys,* not rightfully owned or claimed by any private individuals, or held as commons, belonging to such towns or villages, or that the President of the United States, may not think proper to reserve for military purposes" are reserved for schools, provided, the whole quantity so reserved does not exceed one twentieth part of the whole survey. This act gives no title to the schools, as was determined by this Court in Hammond's case. It was a mere reservation on the part of Congress, of lots partly for the use of the public schools, and partly for military purposes, limiting the number of lots dedicated to the former object to one twentieth of the whole amount of land embraced in the general survey. The act of May 26, 1824, declared it the duty of the individual claimants under the act of 1812, to prove up their lots before the recorder, with a view to enable the Surveyor General to distinguish the public from the private lots. That act also enjoined the surveyor under the instruction of the Commissioner of the General Land Officer, to *survey, designate and set a part* to the towns and villages, so many of the vacant town or village lots, out lots and common field lots, for the support of schools, as the President may not have reserved, before the time fixed for the settlement of the private claims, for military purposes, and not to exceed the proportions fixed in the act of 1812. The recorder by this same act, was authorized to issue his certificate of confirmation to the individual claimants. The act of January 27, 1831, relinquished the title of the United States to the town and village lots, out lots, and common field lots, which had been reserved for the support of schools by the 2nd section of the act of 1812.

It will be seen by reference to these laws, that the United States never parted with their title to the school lots until 1831, and then, the phraseology of the law is so framed as to leave the number and locality of the lots precisely where the acts of 1812 and 1824 had placed them. The title was relinquished in 1831; but to what? To the lots reserved for the support of schools by the second section of the act of 1812. And what lots were so reserved? All lots included in the surveys of the out boundary of the towns or villages, not belonging to private individuals, or held as common—not reserved by the President for military purposes, and not *en masse*, exceeding a certain proportion of the whole tract embraced by the out boundary line.

How could the public schools move a step until the government had ascertained the facts upon which their title depended? Could they claim any particular lot, before a survey of the out boundary was made, and before any lots had been designated and set a part—before it was ascertained how many lots the President might see fit to reserve for military purposes, and before it was known what proportion the reserved lots bore to the area of the whole survey? However, this may be, it is certain that the surveyor was expressly directed to run an out boundary line;—that express provision was made for enabling him to distinguish the private from the public lots; that he was authorized and expressly directed to note this distinction, and to designate and set apart to the schools such vacant lots as were not selected for military purposes, provided they did not exceed one twentieth of the whole area embraced in the general survey. All this the surveyor has done under the direction of the Commissioner of the General Land Office, and these official acts, duly authenticated to the court, I consider as evidence—*prima facie* evidence, that the acts are what they purport to be. Courts of justice will pay so much respect to the official acts of a ministerial or executive officer, as to presume in favor of their propriety, until the contrary is shown. It is a general rule of evidence, having exceptions undoubtedly, like most other general rules; but the present is not one of them.

By the act of 1824, to which we have heretofore alluded, the Recorder (an officer of the United States) was directed to issue certificates to the private claimants, and these certificates have been held *prima facie* evidence of title. Upon what principle shall we allow these certificates of the Recorder as *prima facie* evidence of title in the private claimants, and exclude the official act of the Surveyor General, upon whom the same law devolved the duty of pointing out and setting apart the lots designed for the public schools? The Recorder could not settle definitively the

rights of private individuals, any more than the Surveyor could. Indeed, in the former case, the title of the United States had been extinquished by the act of 1812, and there was certainly much ground for contending that the officers of that government after 1812 ceased to have any control over the private claims. Not so, however, with the school lots. They were still within the control of Congress; after the passage of the act of 1812, and up to the act of 1831, Congress could have diverted the reservation. No specific lots were appropriated to the use of schools by the act of 1812, but further action on the part of Congress was necessary, and accordingly in 1824, the Surveyor General was given specific directions to ascertain the number and locality of the school lots. This duty was not performed until 1840, but when performed, I do not see how we shall exclude the act of the Surveyor, when it seems to constitute an essential link in the chain of title. The survey and designation by this officer must undoubtedly be evidence, that the lots designated as school lots, are such as the President has not thought proper to reserve for military purposes, and that they do not exceed one twentieth part of all the land included in the general survey of the town. On these points, it must be conceded, that this officer was authorized by the act of Congress to decide, and that his decision is conclusive.

His decision upon these questions is conclusive, because no one but the United States, whose agent he was, has any right or interest in disputing it. But he also decides, as he must necessarily do, that the lots designated are within the out boundary directed by the act of 1812; that they are village or town lots, out lots or common field lots, belonging to the village. Upon this question, his decision is not *definitive,* because he is not a judicial officer entrusted with the power of determining between conflicting claims. Yet I understand the survey to be presumptive evidence on this point also, because it is made by an officer, expressly authorized by law to perform the act, and it will be presumed to be correct, until the contrary is shown.

The survey then being admitted to make a *prima facie* case for the public schools, and the defendant having the right to dispute its correctness, it becomes material to settle the principles by which the propriety of the survey is to be tested.

I still think, as I expressed my opinion in the Trotter case, that Congress designed to dispose of every thing within the out boundary they directed; but as the out boundary was not to embrace any thing but the particulars enumerated, to-wit, the town or village lots, out lots and common field lots and commons, the propriety of including a specified

piece of ground within the survey, must after all depend upon the fact, whether it belong to one of these designated classes of lots.

It is certainly intimated in the opinion in the case of Trotter, that the word *out-lot* might embrace tracts of land within the out boundary not known to the Spanish Government as lots; but this idea, upon reflection, I must acknowledge to be inconsistent with the position assumed in that case and still adhered to, that village lots, out lots, common field lots and commons, should alone be comprehended within the out boundary. The same words are used to designate the lots confirmed to private claimants, as to describe those designed for reservation, and the language of the act must lead to the conclusion that the out boundary directed to be run should embrace nothing more than the Spanish town or village, with its appurtenances. The practical difficulty in giving the act this construction, arises from the isolated and distinct position of several parcels of the enumerated classes of lots, in several of the villages mentioned, and particularly in St. Louis. This difficulty induced the belief that the word *out-lot* might have a signification sufficiently comprehensive to include any vacant ground necessarily comprehended by a single connected survey. The evidence now before the court, showing the position of the commons and common field lots, appertaining to other villages enumerated in the act of 1812, besides St. Louis, is calculated to create great doubts as to the propriety of a single continuous out boundary. Where there are several detached parcels of common field lots, separated from the village and the commons by tracts of land, belonging either to the United States or to private persons, it is impossible to make a connected survey embracing the village and its appurtenances, without also taking in lands not coming within the description of either out lots or common field lots, and therefore not reserved for the public schools by the act of 1812. It would therefore seem to be more consonant to the spirit of the act, to make separate surveys of each parcel of lots, rather than to extend the meaning of the word out lot beyond that which it obviously bears when used with reference to the private claimants, so as to authorize a general survey, including these tracts of ground, of irregular shapes and not recognized by the Spanish authorities as appurtenant or *belonging* to the town or village.

Much has been said in the discussion of all the cases before this court involving the rights of the present defendant in error, in relation to the proper meaning of the term out lot. This term, so indefinite in its general acceptation, must be construed in connexion with the subject matter in the view of the legislature. Mere contiguity to the village, coupled

with the fact, that the owner of the lot is an inhabitant of the village, will not alone constitute an out lot within the meaning of the act. These two circumstances might be predicated of any tract of land in the vcinity of the town or village, although cultivated merely as a farm and not subject to the control of the village authorities.

Why were the common field lots regarded as a part of the village or as "belonging to" the village? They did not belong to the inhabitants as a corporation, or to the mass of the villagers, as the commons did, but were owned by individuals; yet they were *subject to the regulations of the village authorities*, and this circumstance determined their character as out lots of the village. Officers were appointed, called Syndics, whose duty it was to see that the fence, which protected these lots from the incursions of the animals, should be properly kept in repair, and that each owner should do his share in this work. So I apprehend that if there were other out lots properly belonging to or rather appurtenant to the village, these lots fell within the control of these village authorities, to be exercised according to the laws and usages prevailing under the government of Spain in this country. This authority may not have been exercised over the out lots to the same extent or for the same purposes, that induced its exercise over the common field lots, but the fact, that the out lots fell within the same jurisdiction as the village lots themselves, was sufficient to indicate their character as appurtenant to the village.

It will appear by reference to the confirmations of Mr. Bates, whilst Recorder, that he uses the term out lots when referring to St. Louis, as mostly, if not entirely synonymous with common field lots. But there may have been other lots which would fall within the designation, as there undoubtedly were in some of the other villages enumerated in the act. This would be a question of fact for a jury to be determined under instructions from the court, explanatory of the characteristics of an out lot.

McBRIDE, *Judge.*

I can see no objection to receiving the survey made by the Surveyor General of the outer boundary line of St. Louis, under the instruction of the land department of the United States, as *prima facie* evidence of where that line should run. If a survey had been made in this case, by the county surveyor or any other individual under an order of the Circuit Court, it would be entitled to no greater verity. In each case, either party feeling aggrieved by the line run, would have a right to show, if such was really the case, that the surveyor had committed an error. The

fact that the Surveyor General is an officer appointed by the General Government and acting at all times under the solemnity of an oath and the instructions of the Government, should raise in the absence of any evidence impeaching the correctness of his official action, a presumption of correctness and impartiality, in the discharge of any duty confided to him by the government. In according this degree of credit to a survey made by him for the purpose of setting apart lands donated by the General Government for the purposes of education from the public domain, I do not see that any principle is violated or the rights of parties in any wise compromitted.

I therefore concur on this point with Judge NAPTON.