## West End Dry Goods Store v. Henry P. Maun et al.

### Gen. No. 13,248.

1. REAL ESTATE COMMISSIONS—*when broker not entitled to recover.* After a broker abandons his efforts to close a deal, the owner is entitled, either by his own efforts or through the aid of another broker, to re-enter upon the negotiations and to conclude the deal without incurring liability to the original broker.

2. REAL ESTATE COMMISSIONS—*what essential to broker's right to recover.* In order that a broker may be entitled to real estate commissions upon a transaction not concluded by himself, it must appear that he was the efficient and procuring cause of the deal as finally closed.

3. REAL ESTATE COMMISSIONS—*effect of rules of real estate board upon.* While the real estate board may undoubtedly make rules and regulations governing and binding upon its members, they are not binding upon and neither can they be enforced against non-members; much less can they be held to constitute a rule of evidence binding or controlling the courts in the trial of causes. Such rules are not equivalent to a custom.

Assumpsit. Appeal from the Circuit Court of Cook County; the Hon. MERRITT W. PINCKNEY, Judge, presiding. Heard in this court at the October term, 1906. Reversed and remanded. Opinion filed April 29, 1907.

I. B. LIPSON and BENJAMIN SAMUELS, for appellant.

MOSES, ROSENTHAL & KENNEDY, for appellees.

Mr. JUSTICE HOLDOM delivered the opinion of the court.

This suit involves a claim of appellees for a commission as real estate brokers, as the efficient procuring agency in securing for appellant the firm of Bernstein & Wolf as tenants for its store building, 530 to 536 Halsted street, Chicago, for a term of six years, commencing May 1, 1903, at an annual rental of $2,700 for the first two years, and $3,000 annually for the remaining four years. The basis of the commission rate is 5 per cent on the rental payable for the first two years, and 1 per cent on the balance of the rental payments.

The employment by appellant of appellees is averred in the two additional counts to the declaration substantially as follows:

"That at the said time and place, to-wit: on the 1st day of May, 1902, in the city of Chicago aforesaid, said defendant promised the plaintiffs, in consideration that the plaintiffs would secure for said defendant a tenant  *  *  * who was acceptable to said defendant, that the said defendant  *  *  * would pay to the said plaintiffs 5 per cent on the first year's rent for the first two years, and 1 per cent of the first year's rent for each additional year which said tenant would undertake and agree to pay  *  *  *  for said premises.  *  *  *  In consideration of said undertaking and promise so made said plaintiffs then and there undertook to and thereafter did secure a tenant  *  *  *  for the premises before mentioned, which tenant was acceptable to, and accepted by, said defendant."

The second additional count avers a promise to pay the usual and customary charges made by real estate and renting brokers in Chicago, averring the usual and customary charges to be as set out in the alleged agreement to pay in the first additional count. The plea of *non assumpsit* was the only plea interposed to the declaration, and the two additional counts subsequently filed thereto. A trial before the court and a jury resulted in a verdict for $378, upon which a judgment, less a *remittitur* of $100, was entered after the over-

ruling of a motion for a new trial against the objection and exception of appellant.

Numerous errors are assigned upon the record, but three contentions are urged upon us in argument. They are, first, the evidence does not establish an employment by appellant of appellees, but does establish as a fact that appellees acted as agents in the transaction for the accepted tenants, Bernstein & Wolf; second, erroneous instructions to the jury; and third, no legal proof as to the value of the services for which commission is claimed.

To maintain the employment of appellees by appellant, appellee Goodman testifies that hearing that appellant desired to sell out and go out of business, he went into appellant's place of business and had a talk with Mr. Samuels, the president of appellant, in which conversation Samuels said they wanted to get out, was disgusted with the place; that there was a long lease; that he could rent to small stores, but didn't care to divide up that way. Goodman then said, "I might be able to give you a good customer for this store and take it up, the whole thing, from you." Goodman then said his customer was not in the same line of business as appellant, they were not in the dry goods business; they were in the furniture business. Samuels said he thought the location a good one for the furniture business. Then Goodman said, "You are aware that I do not want to bother for nothing. If I make a deal, I trust you know you are going to pay me a commission," to which Samuels made, so Goodman says, this reply: "This wouldn't worry you at all; I will take care of you. You go ahead and bring me a man." Goodman says he then went to Bernstein & Wolf's store the same day, and told them he had a place for them. They were then on Blue Island avenue, not far from appellant's store. That day or the next, Goodman says, he took Mr. Wolf into the store of appellant and introduced him to Mr. Samuels as one of the parties about which he talked as likely to rent the store. They showed Wolf around the place and Wolf said he thought it would be big enough. The day following Bernstein said to Goodman, "I will take the place

and see what you can do.  Go over there and talk with the gentleman."  Goodman made an offer of $200 a month, which was refused.  Some correspondence between the parties followed and other interviews, but in the latter part of August the negotiations were apparently abandoned.  Nothing further seems to have occurred subsequent to appellees' letter to appellant dated August 23, 1902.  In the letter of August 5, 1902, occurs the following: "In view of some uncertainty expressed by Mr. Goodman as to the position of his client, it will be necessary to close the matter on or before Thursday, the 7th inst."

In February, 1903, Goodman says he was passing appellant's store when Samuels said to him, "Are your parties going to rent that store?"  Goodman retorted, "No, they haven't; got a store where they are."  Samuels said, "Will they take it now?" and Goodman replied, "They might take it, but I don't think we can do business with you at all."  Samuels and Goodman then went into the store and had some further talk, in which Samuels indicated a willingness to make a lease.  Goodman asked him if he would put it in writing, and he said, "You don't have to have it.  Go and see your people."  Goodman says he then talked with Bernstein and Wolf, but heard nothing more about the deal or the parties until he discovered that the place had been rented to Bernstein & Wolf.  His firm then sent appellant a bill for $270, which they claimed was due them for commissions.  The lease was dated March 13, 1903, presumably the date of the completing of the transaction.  Abraham Bernstein stated that Goodman called his attention to the opportunity to rent the premises of appellant as early as December, 1901, or January, 1902.  Henry Wolf, his partner, also states that Goodman first called his attention to the property.  Goodman's testimony is, without corroboration on the question of employment and promise to pay a commission.  His and Samuels' evidence is diametrically opposed and irreconcilable.

Samuels swears Goodman came to him in the first instance, saying he heard his store was for rent; that he was

in the real estate business, and had a customer for it.   Samuels swears he told Goodman that if he did rent the premises he would want a net price for them, whatever that price would be; that whatever compensation Goodman would get must come from the parties he represented; that appellant would pay no compensation.   That two months after the matter had been dropped Samuels says he met Goodman in a street car, and Goodman said, "Why don't you do something with those premises.   I am pretty sure I can get Bernstein to take them," to which Samuels replied, "Well, I am through with that deal."   From that time until appellees sent their bill to appellant for commissions Samuels says he never had any further dealings or talks with Goodman in relation to the renting.

In this irreconcilable conflict in the evidence it may be said the question of veracity between the disputants was for the jury to settle by their verdict, and did the proof here end we might be willing so to concede, and conceding be content to be concluded by the jury's verdict.   But there are other uncontradicted evidence, facts and circumstances in proof which contribute sustaining force to Samuels' evidence.   In the first place, Goodman says his firm are real estate brokers engaged in the real estate business, duly licensed by the city of Chicago to transact a real estate business within that city's boundaries; yet during all the time he claims to have been working in an attempt to find a tenant for appellant's premises, he never applied to any other person or firm than Bernstein & Wolf, never called the attention of others to the property for lease, and had no negotiation in relation thereto with any other party.   These undisputed facts in themselves would seem to lend some plausibility to the insistence of Samuels that Bernstein & Wolf were the clients of appellees' firm, and that in their interests Goodman directed his efforts, and in this matter he was working for them.   In further corroboration of this contention of appellant are the letters put in evidence by appellees, from the interpretation of which they cannot escape, and by the statements contained therein they are bound.

West End Dry Goods Store v. Maun.

The following are excerpts from some of the letters referred to, written by appellees to appellant. In the one of May 6, 1902, appears: "Our party will take the lease off your hands at the above figures for the unexpired term. Our client is Bernstein & Wolf, furniture dealers." (R. p. 34.) May 13, 1902: "We have succeeded in getting our party to pay $225 per month. * * * Our party would like to have an answer before the 25th of this month." (R. p. 35.) May 19, 1902: "We have succeeded by hard work in getting our parties to raise their offer." (R. p. 36.) June 2, 1902: "We have spoken to our clients again." August 23, 1902: "Abraham Bernstein & H. Wolf have authorized us to make the proposition stated below."

An ingenious but not convincing argument is made, that these expressions are equally consistent with the claim of appellees that they were acting as agents of appellant in their negotiations with Bernstein & Wolf. But the letters emanate from appellees and by their literal construction are opposed to their contention, and are, by fair interpretation, consistent as evidence sustaining the fact contended for by appellant. While it is true that in most cases the landlord pays the compensation of the renting agent, yet the whole matter rests primarily in the contract of the parties. It is not at all unusual for the tenant to pay the agent's commissions for negotiating a lease favorable to him, or so considered, and we cannot predicate our decision on a custom, however general, which is contrary to the greater weight of the evidence. Custom has no place against contract right. If nothing had been said by the parties regarding the payment of commissions, then it might with some show of consistency be urged that appellant would be bound to pay the usual reasonable compensation on an implied promise inferable from the situation of the parties.

We are of the opinion that the evidence discloses not only an abandonment of all the negotiations made by appellees with Bernstein & Wolf, but that the lease was finally completed without any effort of appellees or their intervention in any way, and that such lease was concluded more than six

months after the negotiations by appellees had been dropped. Goodman admits that he did not know of the making of the lease until after the matter had been finally consummated, and there is no evidence that any of the appellees took any part in the negotiations which culminated successfully.

Appellant was not inhibited, after the lapse of so much time, from again opening up negotiations with Bernstein & Wolf, either personally or through another broker, without becoming liable to pay commissions to appellees for what it accomplished independently and without their aid.

Appellees had failed in their negotiations. Appellant was thereafter free to seek, in its own way, for a tenant, and was not debarred from negotiating with Bernstein & Wolf and from prosecuting its efforts to a successful conclusion, if it could, without incurring a liability to appellees for commissions. The point of time when this might be done was when the negotiation with Bernstein & Wolf was abandoned by appellees. As said in Mears v. Stone, 44 Ill. App., 444, "There is no evidence that appellees induced him to change his mind. They were not, therefore, entitled to the stipulated commissions."

Lipe v. Ludewick, 14 Ill. App., 372, is a case where a broker introduced the party, who finally purchased, to the seller. The negotiations were broken off by the broker, and the sale under the terms of the negotiations by the broker not consummated but abandoned. Six months thereafter the owner and the same party introduced by the broker came together, without the intervention of the broker, and concluded a sale, and the court said, in a suit for commission by the broker who originally introduced the purchaser, "Appellant was fully justified in treating all negotiations for a sale by the appellee as abandoned and in making the sale himself, either to Klein or anybody else who would purchase." Davis v. Gassette, 30 Ill. App., 41.

Cases to a similar import, in which sales were made to the parties introduced by the broker after the breaking off of negotiations by the broker, are: Carlson v. Nathan, 43 Ill. App., 364; Singer v. Hutchinson, 61 Ill. App., 308. Judg-

ments for commissions in cases *supra* were reversed by the court.

Both instructions complained of by appellant and given by the trial judge to the jury are objectionable in ignoring the controlling fact as to whether or not appellees had abandoned further negotiation for a lease prior to the consummation of the leasing between appellant and Bernstein & Wolf, and whether, as ultimately concluded, appellees were not the efficient and procuring cause. Unless appellees were the efficient and procuring cause of the making of the lease, they were not entitled to recover commissions from appellant. Hinds v. McIntire, 89 Ill. App., 611.

The only evidence in this record as to the amount of commissions recoverable, if any, rests in the testimony of Mr. Goodman. He testifies only as to the rules of the Real Estate Board in Chicago regulating commissions. While the Real Estate Board may undoubtedly make rules and regulations governing and binding upon its members, they are not binding upon and neither can they be enforced against non-members; much less can they be held to constitute a rule of evidence binding or controlling the courts in the trial of causes. This evidence was not sufficient upon which damages could be assessed. It proves merely a rule of the Real Estate Board. This might be reasonable or oppressive, and what was a reasonable charge by way of commissions was a question for the jury, to be gathered from evidence tending at least to establish the fact. The rules of the Real Estate Board do not establish a custom or usage, for to do so would require that they be acted upon with uniformity, and be so generally known and established as to raise a fair presumption that they were known to the contracting parties so that they may be assumed to have contracted with relation to them and with knowledge of them. The only evidence as to the time the rules were in force is found in that of Goodman, that they were so in force in the years 1902 and 1903. This was far from sufficient to make the rule a custom binding on anybody but the members of the Board, and the failure to prove that the rate established by the rule was reason-

able and customary for such services rendered the proof insufficient upon which damages could be assessed by the jury. Calland v. Trapet, 70 Ill. App., 228; Bissell v. Ryan, 23 Ill., 566.

The record does not disclose that appellees, or any one of them, where members of the Real Estate Board nor the source of Goodman's information as to the Board's rules. The rules of the Real Estate Board do not appear to have been offered in evidence. As said in Calland v. Trapet, *supra,* "It is apparent that the testimony as to usage did not come within the rule of law in respect thereto. Appellee, who did not claim to be a member of the Real Estate Board, testified as to its rules, under which, he said, 'we work.' This is very far from being a statement of a generally known, established, and so well settled custom that therefrom the presumption is raised that both parties contracted with reference to it."

For the errors indicated the judgment of the Circuit Court is reversed and the cause is remanded for a new trial conformable to this opinion.

*Reversed and remanded.*