## BALLENTINE & BOONE, Respondents, v. J. R. MER-CER, Appellant.

### Kansas City Court of Appeals, April 6, 1908.

1. **JURY: Competency: Interest: Common Law.** Persons who are not interested in any wise in the case on trial are competent jurors, although they may have a general interest in the matters involved in the litigation; but interest of that character carries no mark of suspicion, either of malice or favor and does not disqualify. It is only "interest in the cause" which at common law, disqualifies, that is, an interest either direct or indirect in subject-matter of the particular action and not a mere general interest in the class to which it belongs.

2. **REAL ESTATE BROKER: Commission: Employment: Request.** A broker's officious intermeddling in the affairs of another, though they produce favorable results for the latter, should go unrewarded; a request may not be inferred from the mere fact that one renders services for another without objection of such other.

3. **———: ———: ———: ———.** Though a broker offers his services under such circumstances that the vendor must have known that they were offered for his benefit, the acceptance by the vendor will imply an agreement for the employment of the broker as his agent, since, generally, brokers when rendering their services are not expected to work except for pay; and an acceptance of the work may authorize the jury to infer a previous request.

4. **———: ———: ———: ———: Evidence.** On the evidence it is held that the question of plaintiff's employment by the defendant to rent his property was properly submitted to the jury and that at the time of the offer to serve the defendant he was free from obligation to a former employer.

5. **———: ———: Dual Agency: Evidence.** Where the defense is dual agency the burden is on the defendant to show the same; and, *held*, the evidence fails to sustain such burden.

Appeal from Jackson Circuit Court.—*Hon. Edward P. Gates,* Judge.

AFFIRMED.

*Karnes, New & Krauthoff* for appellant.

(1) In State v. Fullerton, 90 Mo. App. 411, it is decided by this court: "It is essential that all causes, as far as practicable, shall be tried by wholly impartial jurors. This is a guaranty of the Constitution which cannot be disregarded by any court." Eberle v. Public Schools, 11 Mo. 247; Fine v. Public Schools, 30 Mo. 166; Fulweiler v. St. Louis, 61 Mo. 479. (2) The demurrer to the evidence interposed at the close of the whole case should have been sustained. Plaintiff's case is bottomed on the theory of an alleged employment of the plaintiffs by the defendant. (3) In the case at bar, the petition pleads that defendant "employed the plaintiffs as his agent to negotiate a lease." It will be noted the action is not based upon an express agreement by the defendant with the plaintiffs to the effect, that if the plaintiffs procured the United Cigar Stores Company as a tenant for the defendant, then defendant would pay the plaintiffs a fixed commission upon the total amount of the rent stipulated in the lease negotiated. On the contrary, the action is based on the proposition that defendant "employed the plaintiffs as his agent."

*Clarence I. Spellman* and *Edward Wright Taylor* for respondents.

(1) Respondents suggests that the examination of Jurors Hunter and Scott above quoted in full wholly fails to disclose any disqualification in the gentlemen mentioned to serve as jurors. (2) There was ample evidence, in fact overwhelming evidence of employment, upon which to go to the jury..

JOHNSON, J.—Plaintiffs, who were partners engaged in the real estate business in Kansas City brought this action to recover a commission alleged to be due them from defendant. The case was tried to a jury and verdict for $1,170 was returned in favor of plaintiffs and, after ineffectually moving for a new trial, defendant appealed from the judgment entered on the verdict.

Complaint is made of the action of the trial court in overruling defendant's challenge of jurors for cause. On the examination of the panel touching the qualifications of its members to sit on the jury, it was disclosed that two were real estate agents, but were not associated in business with plaintiffs, nor interested in the case in any wise. Counsel for defendant challenged them for cause and after an adverse ruling peremptorily challenged them. The jurors were not incompetent, and the trial court rightly held they could be removed only by peremptory challenge. We are cited by defendant to Eberle v. St. Louis Public Schools, 11 Mo. 247; Fine v. St. Louis Public Schools, 30 Mo. 166; Fulweiler v. City of St. Louis, 61 Mo. 479, in support of the contention that the jurors were incompetent. In all of these cases, the challenged juror had a pecuniary interest in the cause. Our attention is not directed to any authority which holds a juror incompetent on the sole ground that his vocation is the same as that followed by one of the litigants. The statutes contain no such provision, nor is the position of defendant countenanced by the rules and principles of the common law. They allowed "a principal challenge" (analogous to the present challenge for cause) "whenever the cause assigned carried with it prima-facie evident marks of suspicion either of malice or favor." [3 Blackstone's Com., 363.] The ground that the objectionable juror had an interest in the cause was one for which a principal challenge might be made. By the term "interest in the cause" is meant an interest either direct or indirect in

the subject-matter of the particular action and not a mere general interest in the class of subjects to which the particular action belongs. A merchant, farmer or servant is not disqualified to be a juror in an action to which another merchant, farmer or servant is a party, though the subject-matter may be of peculiar interest to his calling. Very likely every member of the jury selected had an interest of his own in the subject of compensation of agents and brokers, since nearly every person who owns property or engages in business is compelled at some time to employ agents to buy, sell or act for him. An interest of that character "carries no mark of suspicion either of malice or favor" and, therefore, is not a disqualification. The objection must be ruled against defendant.'

It is argued by defendant with much earnestness and ability that his request for an instruction directing a verdict in his favor should have been granted. Plaintiffs allege in the petition "that during August and September, 1905, the defendant was the owner of a leasehold interest in and to the south one-half of lot No. 9, Swope's Addition to the city of Kansas City, Jackson county, Missouri, and as such he employed the plaintiffs as his agent to negotiate a lease and procure him a tenant for the first floor of the west fifty feet of the aforesaid premises. In pursuance of said employment and appointment the plaintiffs, as such agent of the defendant, procured the United Cigar Stores Company to lease the said first floor of the west fifty feet of said premises from the defendant and that as a result of the efforts of the plaintiffs in this behalf, the defendant made a lease and conveyed his leasehold interest on or about September 19, 1905, in and to the first floor of the west fifty feet of the said premises to the said United Cigar Stores Company at and for the rental of $9,600 per year for a period of five years, or $48,000 for the entire period. . . . That in negotiating said lease and procuring

said tenant their services were and are reasonably worth and of value of twelve hundred dollars and that they have demanded payment of the defendant, which has been refused." In addition to a general denial, the defendant alleged in his answer "that at all the times stated in the petition, plaintiffs were actively engaged on behalf of the United Cigar Stores Company, of Chicago, Illinois, in endeavoring to procure from the defendant a lease for the property described in the petition, and were not acting in any way as the agent of the defendant in the premises. At all of the times stated in the petition of the plaintiffs, plaintiffs were actively engaged in endeavoring to rent property other than the property owned by the defendant, to various parties, and especially to United Cigar Stores Company." The reply was a general denial.

The evidence introduced by plaintiffs disclosed the following facts: Some time before the alleged employment, plaintiffs had acted as agents in the sale of store property on Main street in Kansas City to a Mr. Turner and had been employed by him to procure a tenant for the property. Pursuant to this employment, they entered into negotiations with the United Cigar Stores Company—a concern extensively engaged in the operation of retail cigar stores in various cities, with headquarters in Chicago—and had reached a point where their customer agreed to take the property on the terms proposed when, after some delay, their principal, Mr. Turner, concluded to relet the property to the tenant then occupying it. This left plaintiffs with a good customer on their hands who was willing to pay a large rental for first-class business property on the principal retail street in the city. Defendant was lessee of a business house on one of the busiest corners of that street and his term had five years yet to run. He had sublet the corner room on the first floor to a druggist whose

130 App.—39

term was about to expire and who had decided not to renew his lease. Learning that the room was to become vacant, one of the plaintiffs telephoned defendant and thus relates the conversation they had:

"Well, I called him up, I asked him, I says, 'Is that building on the corner that was occupied by the Owl Drug Store vacant?' He says it was; I told him I thought I could get him a tenant; I asked him the price. He said $700 a month. I says 'I will come up to see you;' he said 'All right, come right up.'" Plaintiff went to the store and had this conversation with defendant: "We went down in the basement there, and I told him as soon as I got down there, I could find him a good tenant. He asked me then for what business, and I told him. . . . I told him for a cigar store. He said that then he says 'I don't believe I will rent it for $700 a month.' I says 'Well, what can you rent it for?' He says, 'I will take $800 a month for it.' 'Now,' he says, before that he says, 'I don't know whether I want to rent it for a cigar store or not.' I says, 'I have got a mighty good customer, they are mighty good people, they will pay their rent every month.' He asked me who they were and I told him. I told him the United Cigar Stores Company. As soon as he heard it was the cigar store company, he became more interested. I told him I thought I could get that price, I says, 'Will you give me until Tuesday on it?' He says, 'Yes, I will give you until Tuesday, and if you cannot close it by Tuesday, I will give you until October 1st.'"

"Q. What did he mean, for what purpose? A. He would give me the agency of the building to rent it."

Counsel for defendant objected to the answer of the witness as not stating what the defendant said, and being a conclusion on the part of the witness.

The Court: "The objection is sustained. Q. Don't tell the jury your construction of it; tell the jury what Mr. Mercer said to you, use his language. Did you

reach an agreement with Mr. Mercer? A. Most assuredly, yes, sir. Q. State what he said. A. Well, he told me that he would give me until October to rent—until Tuesday it was to rent, I believe, the building. Q. For what price? A. $800 a month. Q. For how long? A. For the remaining term of his lease, five years."

Following this conversation, plaintiffs corresponded with the United Cigar Stores Company and in a short time one of the officers of the company came to Kansas City, was introduced by plaintiffs to defendant and, shortly thereafter, procured a lease from defendant under the terms of which he rented the storeroom, for which his company promised to pay a monthly rental of $750 for the first two years and $800 for the remaining three years.

Some time after the transaction was closed, Mr. Boone, one of the plaintiffs, telephoned defendant about the commission and finding defendant disposed to raise some question about it, turned the telephone over to his partner, Mr. Ballentine, who continued the conversation, of which he gives the following version: "After we found the deal was closed, Mr. Boone called up Mr. Mercer. I was in the office and heard his side of the conversation. After talking a little bit with Mr. Mercer, he handed the telephone to me and he says, 'You talk to him,'—there seemed to be some dispute about the commission—and I talked with Mr. Mercer, and Mr. Mercer seemed to think that the commission was too much. Q. What amount did you name? A. $1,200. I told him that was the customary and usual commission in such cases, I had never made any deals for any less. He then spoke about he thought he ought to have a division of the commission. I told him it was not customary to divide; well, he said he was in the real estate business himself. I told him if he was in the real estate business, and had a license, and was a regular agent, I would divide the commission with him, that was customary. He

invited me then to come up and see him and I did so the next day; I went up and saw him. I had a conversation with him in which he still expressed his idea that the commission was too high. . . . I told him I would leave it to arbitrators if it was not all right, I didn't want anything more than was fair. Then he said—we said—I got a little bit hot, and I told him if he didn't pay it I would sue him, although I never sued anybody before in my life, that was the first case I ever had. He said, well, he would consult with his lawyer, and let me know in a day or two. In a day or two, I don't know whether I called him up again, or went up and saw him, then he told me his lawyers had advised him not to pay the commission, I have not seen him since."

The statement of the transaction given by defendant in his testimony does not greatly differ from that of plaintiffs except that defendant denies having any conversation with plaintiffs from which an agreement to employ them might be inferred. He testified as follows with reference to the controversy which followed the execution of the lease: "I received a letter, I think it was about Saturday in the afternoon mail and on Monday I got a telephone call asking me if anything—if everything was closed up by the Cigar Company, and if it was satisfactory and I said 'Yes.' . . . He (Mr. Boone) says, 'When can I come up and get my commission? I said 'Commission—I don't owe you any commission; I have not employed you to rent any store for me, or do any work for me. Q. Prior to that time, had Ballentine & Boone said anything to you about a charge for what they had done, what their charge would be? A. Not at all. Q. What answer did Mr. Boone make when you made that statement? A. He said, 'I certainly did bring a tenant down to you,' he said. I said, 'You certainly did not, you brought a tenant to me, that was the man that you were working for, you were not working for me, I never had authorized you to work for me.' Q.

What did he say to that? A. He said, 'You certainly did, and we shall expect a commission.' Q. Did you make any response to that? A. I said, 'Even if I had employed you, I am practically in the real estate business myself, and you could not get but half of it anyhow.' I said, 'I will go and see my attorneys in this matter anyhow.' "

Plaintiffs assert they were not employed by the United Cigar Stores Company either in the negotiations with Mr. Turner or in those with defendant. It is certain they received no compensation from the company nor any promise of a commission. One of them does speak of the company as "our client" but when fairly interpreted, the entire testimony of plaintiffs contains no intimation of the existence of a confidential relation between them. Throughout the whole transaction, they evidently regarded the company as a valuable customer with whom they might consummate a profitable deal for a principal who had desirable property to lease on satisfactory terms.

Defendant introduced in evidence the deposition of the officer of the United Cigar Stores Company who had charge of the renting of the property. Witness was not asked whether he had employed the plaintiffs, but from what he did say, the inference is irresistible that had the question been asked it would have been answered in the negative. He identified some telegrams and letters received from plaintiffs during the progress of the negotiations with Mr. Turner and defendant, and it is contended by defendant this correspondence shows plaintiffs were acting in both matters as the representative of the company, or, at any rate, were attempting to serve two masters. A careful consideration of the letters convinces us that their contents are consistent with the claim of plaintiffs that they were not employed by defendants and are not indicative of any bad faith toward either Mr. Turner or defendant.

A witness introduced by plaintiffs testified that shortly after the lease was executed, he met defendant at lunch who told him of the renting of the property, and in answer to a question of the witness, stated that Ballentine & Boone had rented it for him. This conversation is denied by defendant.

The argument of defendant that the demurrer to the evidence should have been sustained may be summarized under two heads. *First,* that the evidence, when considered in the light most favorable to plaintiffs, still fails to show that defendant employed plaintiffs or requested them to act for him; and, *second,* the evidence does show that plaintiffs were employed by the United Cigar Stores Company and, therefore, could it reasonably be said they were likewise employed by defendant, then they were attempting to serve two principals whose interests were antagonistic, without the knowledge and consent of both to such dual employment.

Turning to the first of these propositions, we shall refer to the principles of law by which we are to be guided in its solution. The mere fact that a broker without request but of his own volition brings a customer to a vendor will not, of itself, imply an agreement on the part of the vendor to pay for services thus thrust upon him. Officious intermeddling in the business affairs of others, though it may produce valuable results to the interested parties, should go unrewarded. The burden was on plaintiffs to show, not only that they brought defendant a customer with whom he dealt but that the service was performed either at the request of defendant or with the mutual understanding that it was not voluntarily proffered but was to be rewarded with reasonable compensation. It was said in Hiemenz v. Georger, 51 Mo. App. 586: "But a request, whether shown by direct or inferential evidence, is essential in all cases of contracts, and it is not the law that such request may be inferred from the mere fact that one renders services for another

without objection on the part of the person for whom such services were rendered, and that such fact amounts to an acceptance of the services with a promise to pay for the same." The statement of this principle in the following extract from the opinion in Campbell Printing Press & Mfg. Co. v. Yorkston, 32 N. Y. Supp. 263, is as clear and pointed as any to be found in the books: "It is well settled that if a broker, without a previous request, brings a customer to a vendor, and the latter, without further acceptance of the broker's services, takes the customer, the broker is not entitled to compensation. The owner is not obliged to refuse a possible customer because services which he has not requested have been obtruded upon him. Nor can he be enticed into a liability for commissions without his knowledge. In order to entitle the broker to commissions, there must either be an actual employment or a ratification and acceptance of the broker's acts, but in such case the intent to ratify must be plain, and surely there could be no ratification where no claim was made by the broker, and the fact that he was acting as broker was not drawn to the attention of the seller at the time. If there was no agency or agreement to employ plaintiff, defendant's subsequent acts in consummating a bargain with a party introduced by plaintiff, would not create a liability. The mere fact that plaintiff had been instrumental in bringing the parties together, as any third party might have volunteered to do, would not debar the defendants from treating with him, nor if they did so, either directly or through plaintiff, would it establish or recognize an agency, in the absence of any agreement between the parties, and against the consent of the defendants." Other cases in point to which we have been cited are Butts v. Rubey, 85 Mo. App. 405; Brady v. Machine Co., 83 N. Y. Supp. 663; Haynes v. Fraser, 78 N. Y. Supp. 794; Fowler v. Horchke, 65 N. Y. Supp.

638; Downing v. Buck, 98 N. W. 388; Barton v. Powers, 65 N. E. Rep. 826; Viley v. Petit, 29 S. W. 438.

But where the conversation of the parties, their subsequent conduct and the circumstances of the transaction show the vendor must have known that the services were offered for his benefit—were to be employed in his behalf alone—and that they were being offered by the broker with the expectation of receiving the usual commission for them, the acceptance by the vendor will imply an agreement for the employment of the broker as his agent and will be sufficient to establish between them the confidential relation of principal and agent. It is customary for brokers to solicit employment; their knowledge of the conditions of supply and demand, relating to the commodities in which they deal and of persons who are in the market to buy and sell, is a part of their stock in trade and is an important factor in giving value to their services. Generally, they do not work except for pay and, when they tender their services, it is commonly understood the usual commission will be demanded if the services are accepted and prove beneficial. To support their claim for compensation, plaintiffs were not required to do more than to show from all the facts and circumstances that defendant knew they were brokers who, in the prosecution of their vocation, were offering their services to him for his benefit and were not approaching him as the representative of the other party to the proposed transaction. As was said in Hiemenz v. Goerger, supra, "When a person under such circumstances avails himself of the services of another the jury may, from all the circumstances, infer a previous request."

Tested by these rules, the evidence of plaintiffs was sufficient to take to the jury the issue of their employment by defendant. They told him they had a customer in tow, but their offer was to serve him. He knew they were soliciting employment and his acceptance of their

services was, in effect, an agreement to pay them a reasonable commission. With these facts before him, coupled with the additional evidence of the admissions made by defendant after the lease was executed, the learned trial judge could not well do otherwise than to send the case to the jury. Defendant, at first, admitted not only to plaintiff but to a stranger to the transaction, the fact of the employment of plaintiffs. His only complaint was of the amount of the charge and it was not until that subject caused an irreconcilable disagreement that he raised the question of plaintiffs' employment.

There is no merit in the argument that plaintiffs' conduct in not seeking other customers who might be willing to pay more for the property indicated they did not conduct themselves as the agents of defendant. They procured a customer who was ready, able and willing to take the property on the terms proposed by their principal and that is all either law or business morals required of them. It may be said with good reason that the result of hawking the property around might have been injurious to the interests of their principal. Nor do we think plaintiffs fairly may be criticized on the ground that during a certain period they acknowledged allegiance both to defendant and Mr. Turner, their first employer. As we have said, the fact indubitably appears from the evidence before us that their confidential relation with Mr. Turner had ceased before they sought employment from defendant. Its termination absolved them from all duty to him and left plaintiffs free to engage in the service of another principal.

Passing to the second proposition, what we shall say on this subject will sufficiently dispose not only of the demurrer to the evidence but also of the objections urged against the rulings of the court in the giving and refusal of instructions. The burden of proof was on defendant to show plaintiffs were the agents of the United

Cigar Stores Company and failed to disclose the fact of their dual employment to both principals. We find no evidence in the record before us from which it reasonably may be inferred that plaintiffs were the agents of that company. We concede isolated expressions are to be found in some of the letters written by plaintiffs to the company which are consistent with defendant's theory but, taken with the context, they are equally as consistent with the contrary view and doubtless, should be considered as mere courteous assurances of efforts put forth by plaintiffs to transact business with the company as with a customer with whom they would deal at arm's-length. In the face of all the positive evidence to the effect that plaintiffs had no employment with the company, the letters under consideration were barren of evidence of sufficient probative strength to raise a debatable issue of fact. Neither judge nor jury would have been justified in basing a conclusion on nothing more than conjecture or suspicion and the learned trial judge was right in his view that defendant had completely failed to sustain his burden of showing the existence of a dual agency.

No error was committed in overruling the demurrer to the evidence nor does any appear in the instructions. The judgment is affirmed.    All concur.