RALPH LEONARD, RESPONDENT, v. C. W. DOUGHERTY, ET AL., DEFEND-
ANTS, C. W. DOUGHERTY, APPELLANT.*

Kansas City Court of Appeals.   June 6, 1927.

*Corpus Juris-Cyc References: Appeal and Error, 4CJ, p. 897, n. 81;
Brokers, 9CJ, p. 540, n. 53; p. 656, n. 44; Customs and Usages, 17CJ, p. 450,
n. 42; p. 452, n. 48; p. 467, n. 60; p. 501, n. 32; p. 502, n. 33; p. 522, n. 62.

*Stanton, Hardaway & Moritz* for respondent, Collins.

*Harry G. Kyle* and *Walter A. Raymond* for appellant.

BLAND, J.—Plaintiff filed in the court below a bill of interpleader
stating that he owed a real estate broker's commission growing out of
a trade of certain real estate owned by him; that said commission was
being claimed by the defendants and asked the court to determine
who was entitled to it.   Defendant, Brady, disclaimed any interest
in the commission except through the defendant Collins and the
cause has been dismissed as to the former.   The contest was, there-
fore, between Collins and Dougherty, Collins claiming to be entitled

to one-half of the commission and Dougherty to the whole thereof. The court found that Collins was the procuring cause of the contract of exchange in question and entitled to the agreed commission, and further found that Dougherty was a sub-agent of Collins and entitled to one-half of the commission and rendered* judgment accordingly. Dougherty has appealed.

The controversy is over a commission earned by reason of the procurement of a contract of exchange of plaintiff's apartment and residence property in Kansas City, Missouri, for a farm in Carroll county. This contract was entered into upon November 2, 1925, between plaintiff and one R. M. Sloan, the owner of the Carroll county farm. Collins had nothing whatever to do with the procuring of this contract of exchange, which was afterwards rescinded by the parties, and admitted as much at the trial, not being even acquainted with the owner of the farm and knowing nothing about the trade until November 9th or 10th, 1925, seven or eight days after the contract was consummated, but claims that he is entitled to one-half of the commission because, using his own language, "I put the two men together" (plaintiff and Dougherty.)

Plaintiff learned of the Carroll county farm about a week before the contract was executed when he was called by telephone by Dougherty, a real estate broker in Kansas City, who worked up the trade. The evidence shows that there was no agreement between plaintiff and Dougherty at the time the contract of exchange was entered into by them as to what the commission should be, but plaintiff testified that after the contract was drawn up and in the hall of the hotel where it was signed, and during the same evening, Dougherty and himself agreed upon the commission; that afterwards there was a disagreement about what was agreed upon and a few days subsequently the matter was settled by an agreement between the two that the commission should be $1000, to be paid by a note owned by plaintiff upon which there was an unpaid balance and if this balance did not amount to $1000, the difference between it and said sum of $1000 was to be paid by plaintiff in cash.

The history of the relationship existing between plaintiff, Collins and Dougherty is as follows: In the spring of 1924 Collins, a real estate broker in Kansas City, was a customer of plaintiff who was in the grocery business in that city, and learned that plaintiff had the apartment and residence property in question which he desired to trade for a farm and plaintiff listed his said property with Collins for the purpose of procuring such a trade. He did not give Collins an exclusive agency but at no time did he list his property with any other person. Collins testified that in October, 1924, he got in touch with a Mr. Miller of Lee's Summit and a Mr. Bird of Harrisonville, real estate brokers, who represented a Mr. Coats, the owner of a

farm in Cass county: that Miller referred the witness to Dougherty who told him "about the land that he had down in Cass county, that they would trade for buildings here in town;" that negotiations were started for the trade of plaintiff's property for the farm, plaintiff being represented by the witness and Coats by Miller, Bird and Dougherty; that finally a contract was drawn (there was other evidence that this contract was signed by plaintiff but was never signed by Coats); that negotiations for the trade continued until February or March, 1925, when they were abandoned; that during the negotiations Dougherty found out who was the owner of the city property and where it was located; that when it was concluded that the trade for the Coats farm could not be made the witness told Dougherty to "look up something else;" that Dougherty "would state he would do so;" that in March, 1925, Dougherty "put up" a 400-acre farm near Freeman, Missouri. It seem that Miller was also an agent for the owner of this farm. Plaintiff testified that negotiations were carried on in reference to this farm, looking to a trade between plaintiff and the owner of the farm, Collins representing plaintiff and Dougherty "represented Miller" and Bird. These negotiations likewise fell through.

Collins testified that after this "Mr. Dougherty put me up a number of farms," one in Jackson county, Missouri, and one below Belton, Missouri; that the witness "put them up" to plaintiff but neither one of them suited the latter; that in August or September, 1925, Dougherty spoke to him about a farm in Clay county and Collins attempted to interest plaintiff in this farm without success; that in "this transaction" he represented plaintiff and Dougherty represented "the man that owned the farm." That these negotiations for the various farms mentioned continued up to about three of four months before the trade with Sloan. Collins testified—

"Q. And during all that time they (the negotiations) were continuous and not interrupted. You continued to represent Mr. Leonard? A. I represented Mr. Leonard and he (Dougherty) represented the farm that he put up to me."

That the witness never introduced Dougherty to plaintiff and thought that they did not meet until after the Coats deal fell through.

On direct examination Collins testified, "I listed the property with Mr. Dougherty" without explaining what he meant by the use of the word "listed." On cross-examination he testified—

"Q. What did you do with respect to putting it in his (Dougherty's) hands? A. I told him what I had and he told me what he had in the way of a farm, and I told him what I had in the way of property of Mr. Leonard's.

"Q. Did you ever sign any written listing with Mr. Dougherty? A. No, sir, I did not."

Unless this evidence on cross-examination shows a "listing" of the property by Collins to Dougherty, there are no *facts* testified to, as far as the record discloses, showing any such listing. Collins further testified on cross-examination that during the time he was negotiating with Dougherty no one else offered any deals to him for plaintiff's property; that he talked to one other man about it, a Mr. Thompson, "on different deals;" that he talked to Dougherty twenty or more times in reference to the various farms during their negotiations and that Dougherty would tell him "what the farm was, talked it over and told me what kind of a farm it was . . . I told him about the property (plaintiff's) and he gave me a list of the farms that he had to put to Mr. Leonard."

Collins testified that he had nothing whatever to do with bringing plaintiff and Sloan together in making the deal in which the commission was earned; that Dougherty never told him anything about the deal and that he was not present at any time during the negotiations—

"Q. You are not claiming this commission because of anything you did to perfect this deal, you are simply claiming it because you claim to have originally brought Mr. Dougherty in touch with the Leonard property? A. I claim that I am entitled to half of it because I put the two men together."

"Q. Mr. Dougherty and Mr. Leonard? A. Yes, sir.

"Q. And that was more than a year before this happened, when you first brought them together. A. Yes, sir. . . .

"Q. And it is your idea that when one real estate man learns of a piece of property through another real estate man that any future dealings that he has on that property he should split fifty-fifty with the man through whom he first got acquainted with that property? A. I surely do."

He was asked:

"Q. (The Court): What did you and Mr. Dougherty say to each other about commissions in the event of sale or trade? A. We talked several times and we were, that is once, I was to divide part of my commission with him. That is when we was on the Coats farm. I believe I was to give him, if I ain't mistaken, $200 of our commission, Mr. Brady and I was in that, I agreed to give him $200 of that commission. They said there would not be enough in it for three of them and I agreed to give them $200.

"Q. Did you have an understanding at each time you took up a trade? A. That each one was to look after their commission from the party that they had."

Dougherty testified that he had no negotiations whatever with either Collins or Brady and did not see them from the time that the Coats deal fell through, which was in December, 1924, until after the trade between plaintiff and Sloan.

Plaintiff testified that he first met Dougherty in July or August, 1924, when the latter called him up one day and said, "A gentleman had a farm out by Greenwood and he wanted to take me down and show it to me" and that he and Dougherty went to see this farm and and that this was the first time he met Dougherty; that this was before the deal over the Coats property. Collins had nothing to do with the Greenwood deal. Dougherty and one Brauner testified that the latter told the former in January, 1924, that plaintiff had the apartment and residence property in question which plaintiff desired to trade for farm property. Collins testified, in effect, that neither Brauner nor Dougherty knew anything about plaintiff's property until he told Dougherty of it at the time of the Coats deal.

One Lowman, a real estate broker, of Kansas City, Missouri, who represented Sloan in negotiating the contract of exchange, testified in behalf of Dougherty in reference to his and Dougherty's efforts in bringing about this contract. On cross-examination counsel for Collins asked him, " 'What is the rule of the real estate board where an agent has property listed for sale and he tells another agent,' 'I have got a client out here who has a certain piece of property that I consider a bargain; can you find me a buyer for it?' Under those circumstances how do you handle the commission, in case the agent has got a buyer? A. That is always prearranged." "Q. What is the custom, if you know?" The witness answered to the effect that when an agent having property listed induces another agent to help him sell it, that the custom was to divide the commission "fifty-fifty."

"Q. And that has been the rule here all the time ever since you have known the practice of real estate men in this community? A. That depends on where it comes from and how it comes and under what conditions."

On redirect examination the witness was asked what was the custom where one agent has property listed for sale and "asks another real estate agent to help him make a particular deal, and that deal falls through, and a year later the second real estate man goes direct to the owner of the property and makes a deal for the property," as to whether the first agent "being entitled to any commission." The witness answered, "I don't think that he would be entitled to any." On recross-examination he was asked if he had property listed for sale and should go to another agent and ask the latter to help him sell it, and the witness would start negotiations and the deal would fall through and then a number of deals be gotten up between the agents, all of which would fall through, and, finally, within three or four months after the last effort, the second agent found out who owned the property and should go direct to the owner with a buyer and sell the property. "Q. . . . what do you think about your

right to part of that commission?" The witness answered, "I would have no right unless I had a contract for a specific time for the sale of the property." . . . "Q. That *is your code of ethics*, is it? A. Yes, sir." On redirect examination the witness answered that he did not know of any custom with reference to a situation where one agent learns of the ownership of property through another agent as to "the second real estate man's dealing direct with the owner."

Counsel for Collins asked his expert witness, McDaniel—

"Q. What, Mr. McDaniel, is the custom among real estate agents where one agent lists a farm or apartment house for sale or trade and he engaged another agent to help him procure a deal for it, and the two of them work jointly and procure a deal, what is the custom as to the division of the commission? A. Generally, fifty-fifty."

He was shown Article 7 of the Code of Ethics of the National Association of Real Estate Boards, No. 1, and asked if the rule covered therein "is *adhered to and followed* by agents and brokers in this community?" The witness answered in the affirmative. Thereupon over the objection of counsel for Dougherty, said rule was introduced in evidence. It read as follows:

" 'When the realtor accepts a listing from another broker the agency of the broker who offers the listing should be respected until it has expired and the property has come to the attention of the accepting realtor from a different source, or until the owner, without solicitation, offers to list with the accepting realtor. Furthermore, such a listing should not be passed on to a third broker without consent of the listing broker.' "

On cross-examination he testified—

"Q. Mr. McDaniel, what is the custom among real estate brokers as to a commission for the sale of property where the agent actually makes the sale, assuming that he has learned of this property through the first agent some years prior thereto and during that year there has been no other negotiations or no recognition of the first agent having authority over this property and then a year later the second agent goes direct to the owner and makes a deal, what is the custom as to the commission under those circumstances? A. Well, *the custom in my office,* the way I have always conducted it, has been to recognize the first agent. I always go back to my office and recognize the man from which I receive the property.

"Q. Over how long a period? A. I place no time limit on them. I think he is entitled to his listing the same as the merchant to the goods on his shelf.

"Q. In other words, if you first learned of a piece of property ten years ago and you haven't heard from him since and then you go back and hunt him up? A. Yes, sir, *that is my rule.*

"Q. You don't know of any custom among real estate men to that effect? A. Yes, sir, *most men I deal with*. I don't know as to ten years. Of course that probably would be—that is quite a long time, of course.

"Q. You said there was no limit? A. Well, there isn't *with me personally*. I recognize the source from which I obtain the property.

"Q. Isn't it a fact that if there was any such custom it would be impossible to deal in real estate? A. I couldn't tell you about that, I think it is the only fair way though. . . .

"Q. (MR. RAYMOND) Let me ask you this, Mr. McDaniel, supposing that the first real estate agent having the city property goes to another real estate agent at a particular time and says, 'Find me a farm;' the second agent offers a farm; they are unable to make the deal; would you call that a listing with the second agent? A. No."

He explained this by saying that an agent had no right "to list another man's property."

Collins, on cross-examination testified that he was familiar "with the customs, etc., among real estate men."

"Q. And *it is your idea* that when one real estate man learns of a piece of property through another real estate man that any future dealings that he has on that property he should split fifty-fifty with the man through whom he first got acquainted with that property? A. I sure do. . . .

"Q. Supposing a real estate agent first learns of a piece of property through another agent, we will say the second agent, then later on he deals with respect to this same property with a third agent and then later on he deals direct with the owner of the property. Which of these two agents that he dealt with previously would be entitled to the commission? A. *I think* the man that put the property up to him in the first place.

"Q. The first man? A. Yes, sir."

Collins's witness, Brady, was asked by the former's counsel—

"Q. Are you familiar with the customs and rules of the real estate brokers, real estate agents and brokers in this community with regard to *their code of ethics* and method of division of their commissions? A. Yes, sir.

"Q. What is the method or custom of division of commission where property is listed with one agent and he enlists the services of another agent to help sell or trade the property? . . . A. We usually split the commission fifty-fifty.

"Q. That is the custom recognized by the Real Estate Board? A. Yes, sir."

This being an equity case we are privileged to come to our own conclusion as to the weight of the evidence. But it is unnecessary for us to view the evidence from this standpoint for the reason that, even

taking all the evidence in its most favorable light to the defendant, Collins, we do not think that he is entitled to any part of the commission earned in procuring the contract of exchange between plaintiff and Sloan and that the court erred in finding that his efforts were the procuring cause of the sale and that Dougherty was his sub-agent. Collins had nothing to do with the trade out of which the commission grew and there is no question but that he was not the procuring cause of the sale (English v. Page, 236 S. W. 392, Rawlings v. Waddill, 206 Mo. App. 555, 560, 561), unless Dougherty was his sub-agent and for that reason he became the procuring cause through his sub-agent.

We do not think that there is any evidence tending to show that Dougherty was the sub-agent of Collins. There is a contention made on behalf of Collins that in the trades attempted to be negotiated for plaintiff's property by Collins and Dougherty that Dougherty was merely a middle man and did not represent the owner of the farms but was merely assisting Collins. However, all of the testimony shows that Dougherty was representing the owner of the particular farm or his agent or agents and Collins the plaintiff. It is true that there is evidence tending to show that Dougherty was working with other agents who represented the owners of some of the farms and may have been merely assisting them but Collins himself was quite confident that Dougherty was at all times on the opposite side of the deals attempted to be negotiated and, at the trial, counsel for Collins stated that he was contending that Dougherty "was the agent for the other party." The fact that Dougherty first heard of plaintiff's property through Collins and that plaintiff never listed his property with Dougherty is immaterial as to the question as to Dougherty's right to the entire commission, in view of the positive testimony that Dougherty was not representing plaintiff in the transactions in which Collins was a participant (Shapiro v. Shapiro, 103 N. Y. Supp. 305, 306). In the absence of any testimony tending to show that Collins employed Dougherty to render services on behalf of the former as agent of the owner, in making the trade for plaintiff's property, we are unable to see how it can be claimed that Dougherty was his sub-agent. It is true that in one instance, the Coats deal, there were three agents interested on Coats's side of the deal, including Dougherty, and the commission that Coats was to pay was not enough to recompense his three agents when divided between them, so Collins agreed to give them $200 of his commission. This was not because Dougherty was representing Collins but the inference is that Collins took this action in order to make the deal sufficiently interesting to Coats's agents to cause them to work hard on it.

All that Collins claimed that he did with reference to interesting Dougherty in the matter of trading plaintiff's property was that,

"I told him what I had and he told me what he had in the matter of a farm and I told him what I had in the matter of property of Mr. Leonard's." Collins also testified that he was claiming a part of the commission because "I put the two men' together" (Dougherty and Leonard); that is to say, he was the cause of their becoming acquainted with each other. It naturally follows that unless they had met, there would have been no contract of exchange executed by plaintiff and Sloan. But the fact alone that Collins worked hard on other deals for plaintiff and was the cause of Dougherty's meeting plaintiff, would not entitle Collins to any part of the commission in the Sloan deal with which he had nothing to do. [English v. Page, supra; Rawlings v. Waddill, supra.] There was never any "listing" of the property by Collins with Dougherty as that term is ordinarily understood. Where one lists property with another the latter is to represent solely the former and not the opposite owner in the trade or sale. Of course, the buyer and seller in a sale and the opposite owners in the exchange of property are adversary parties and one who lists his property with an agent for sale or exchange expects that agent to protect his interests, therefore, ordinarily one who represents the adverse party in a transaction cannot be a sub-agent of the first agent unless with the consent of both owners of the property involved. [De Steiger v. Hollington, 17 Mo. App. 382; Rosenthal v. Drake, 82 Mo. App. 358.] It was held in the case of Raisin v. Clark, 41 Md. 158, that a custom that real estate brokers were entitled to a commission from both parties to a real estate trade was contrary to established principles of law and would not be countenanced by the courts.

There being no evidence of any contract between Collins and Dougherty whereby Dougherty was to act for Collins in the latter's capacity as agent for plaintiff. There could not have been any relationship of sub-agency existing and Collins must rely entirely upon a custom among real estate brokers, which he attempted to show, in order to establish any agreement between himself and Dougherty for a division of the commission in the trade between plaintiff and Sloan. However, it is well settled that a contract cannot be created by custom. It was said in State ex inf. v. A., T. & S. F. Ry. Co., 176 Mo. 687, 712, "Usages and customs may be useful in the interpretation of a contract which was made with respect thereto, but cannot be held to create them." [See, also, State ex rel. v. Public Service Commission, 269 Mo. 63, 76; 17 C. J. 501, 502.] It might be that where there is an *agreement* of sub-agency or one to divide a commission and the agreement does not cover the question as to how such a commission is to be divided, that a custom in the real estate brokerage business may be shown as to how the commission is divided under the

circumstances, but a contract in the first instance cannot be established by custom.

Aside from this, the evidence is not sufficient to convince us that there was a "custom" to divide a commission such as the one involved in this case under the circumstances existing in this case even as testified to by Collins. In some instances the hypothetical facts upon which the testimony regarding the custom is based, are not like the facts in this case. Some of the witnesses in regard to the alleged custom based their testimony in reference to this matter merely upon what they would do under the circumstances, and others, upon what was their understanding of the ethics of the real estate profession, and some of them upon what they understood the "custom" to be, but, for the most part, none of the testimony was competent.

"Witnesses must testify to facts and not inferences deducible from them. He may testify that such was in fact the custom but *not that such being the fact he should consider the custom so and so.* [Lawson, Usages and Customs, 101.] To prove the existence of a custom, something more than the judgment or conclusion of the witness called to support it is required. A custom is the result of usage and can only be properly shown by proof of the usage from which it may be claimed to be derived. [Shields v. K. C. Sub. Belt Ry. Co., 87 Mo. App. 637, 644.] (Italics ours.)

A practice in order to become a custom must be definite, fixed and reasonable and must exist for a sufficient length of time to have been known by the parties involved. [Corbitt v. Hanson, 124 La. 108, 110; West End Dry Goods Store v. Maun, 133 Ill. App. 544, 551, 552; 17 C. J.; pp. 522, 526.] We are doubtful whether the custom which Collins would be required to rely upon to establish the agreement, if it could be so established, would stand the test of reasonableness. If such a custom were recognized as valid, great confusion would arise so that where several brokers were involved it would be extremely difficult for the owner to know as to whom he owed the commission and for the various brokers to know as to what part, if any, of the commission they would be entitled to.

As to the code of ethics of the National Association of Real Estate Boards, assuming that the code of ethics of this board was sufficiently proved as having been followed to such an extent in Kansas City as to amount to a custom among real estate brokers, it does not apply to the facts in this case because it refers to a broker "accepting a listing from another broker." From what we have said it is apparent there was no listing of plaintiff's property by Collins with Dougherty.

We have examined the case cited by the defendant Collins and find them not in point. Tosh v. Kirshner, 248 S. W. 994; Hayes v. Grisham, 274 S. W. 106, Wass v. Atwater, 33 Minn. 83, are entirely unlike the case at bar.

The judgment is reversed and the cause remanded with directions to the lower court to enter a decree awarding the fund to defendant Dougherty. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.