**Edward R. KOHN, Plaintiff-Appellant,**

v.

**Kimble A. COHN, and the Old Spaghetti Factory International, Inc., Defendants-Respondents.**

No. 39065.

Missouri Court of Appeals,
St. Louis District,
Division Three.

May 16, 1978.

Morton R. Bearman and Sylvan Agatstein, St. Louis, for plaintiff-appellant.

Schmitz & Fischer, J. Peter Schmitz, Terry E. Brummer, Mary Stake Hawker, St. Louis, for defendants-respondents.

GUNN, Presiding Judge.

Plaintiff, Edward R. Kohn, brought suit against defendant, Kimble A. Cohn (defendant) to collect real estate commissions allegedly due for services in procuring Old Spaghetti Factory International, Inc. (Spaghetti Factory) as a tenant in defendant's building. A second count alleged a civil conspiracy between defendant and Spaghetti Factory to deprive plaintiff of his commissions. The trial court granted summary judgment in favor of defendant on the count seeking the real estate commissions. On Spaghetti Factory's motion, the trial court dismissed the conspiracy count for failure to state a claim upon which relief

could be granted. We affirm the trial court's action.

Plaintiff concedes that if the summary judgment finding for defendant is upheld on the claim for real estate commissions, then the count alleging conspiracy to deprive him of his real estate commissions must necessarily fail. Therefore, we first consider the summary judgment ruling, and in so doing we indite some fundamental legal precepts relating to summary judgment.

We must accept as true all facts in evidence favorable to plaintiff's right of recovery and resolve all reasonable doubts in his favor. *Stanturf v. Sipes,* 447 S.W.2d 558 (Mo.1969); *Allen v. St. Luke's Hosp.,* 532 S.W.2d 505 (Mo.App.1975); *Hurwitz v. Kohm,* 516 S.W.2d 33 (Mo.App.1974.); *Pagan v. City of Kennett,* 427 S.W.2d 251 (Mo.App.1968). If the evidence, when viewed in such light, presents no genuine issue as to any material fact and if the movant has carried his burden to show by unassailable evidence that he is entitled to judgment as a matter of law, then the summary judgment must be sustained. Rule 74.04(c) VAMR; *Allen v. St. Luke's Hosp.,* supra; *Pagan v. City of Kennett,* supra; *Brown v. Prudential Ins. Co.,* 375 S.W.2d 623 (Mo.App.1964). The existence of minor factual disputes does not bar summary judgment. To have such an effect the disputed issues must involve material facts, i. e., those which have legal probative force as to a controlling issue. *Ware v. St. Louis Car Co.,* 384 S.W.2d 287 (Mo.App. 1964).

The evidence before the trial court consisted of the pleadings, depositions from both plaintiff and defendant, documentary evidence consisting primarily of correspondence between the three parties, and affidavits from two local realtors which purported to set forth the custom in the real estate industry in the St. Louis area relating to liability for commissions.

The evidence viewed in the light most favorable to plaintiff established that plaintiff is a licensed real estate broker associated with his father's firm, Louis T. Kohn

Realty Co. In the spring of 1975 he was the managing agent for the Levee Building, located at Second and Delmar Streets, in the Laclede's Landing area of St. Louis. As managing agent he actively sought potential tenants for that particular building. Plaintiff, though he had no formal agency agreement with any parties other than the owners of the Levee Building, also attempted to secure buyers or lessees for the other property in the vicinity.

In early 1975, one of the owners of the Levee Building suggested that plaintiff inquire if Spaghetti Factory would be interested in locating one of its restaurants in his building. Following the suggestion, in early April, 1975, plaintiff visited the Denver, Colorado Spaghetti Factory and concluded that it was an operation suitable for the Laclede's Landing area in St. Louis. On May 1, 1975, plaintiff telephoned an executive of Spaghetti Factory at its home office in Portland, Oregon to discuss the possibility of locating one of its restaurants in the Laclede's Landing area. He then followed with a letter which briefly described the history, location and redevelopment plans for Laclede's Landing and invited a representative of Spaghetti Factory to visit St. Louis.

Thereafter, Spaghetti Factory contacted plaintiff and arranged for a meeting in St. Louis. On May 22, 1975, plaintiff met with three representatives of Spaghetti Factory in St. Louis at the Levee Building. After a brief inspection of the premises, the Spaghetti Factory representatives told plaintiff that the Levee Building would not suit their needs as they required a minimum of 10,000 square feet on a single floor for their restaurant facility. Plaintiff and his father then took the Spaghetti Factory representatives for a walking tour of the Laclede's Landing area to look for suitable buildings. Upon seeing defendant's building they concluded it would be a good prospect for the restaurant. Accordingly, the peripatetic fivesome—plaintiff, his father and the three executives from the Spaghetti Factory—went to defendant's office without an appointment, introduced themselves and exchanged business cards. At this time defendant had no acquaintance with any of the parties. A tour of defendant's building followed with the Spaghetti Factory representatives making a sales presentation of their organization as a suitable tenant for defendant's building. At the close of the meeting plaintiff asked defendant to send him a copy of the building's floor plan. Defendant then asked how he could contact the Spaghetti Factory, to which plaintiff responded, "I [plaintiff] said you contact me, I'll get ahold of Spaghetti Factory." Plaintiff ultimately sent the Spaghetti Factory the copy of defendant's building floor plan which had been supplied by defendant, along with a copy of the Levee Building floor plan, in spite of the fact that use of the latter by the Spaghetti Factory had already been rejected.

Plaintiff and defendant had no further contact until June 26, 1975 when the two met with a Mr. Ed Fisher. A general discussion was held regarding possible use of the defendant's building in connection with the overall redevelopment of the Laclede's Landing area. The record is recondite as to the identity of Mr. Fisher. He apparently had no association with either defendant or plaintiff, but according to plaintiff, "Mr. Fisher completely took over the conversation." Plaintiff testified that at the June 26 meeting he informed defendant that he was attempting to secure a tenant for defendant's building and that he would contact defendant if he found such a tenant. There is nothing in the record to indicate acceptance by defendant of plaintiff's voluntary offer. At the close of the June 26 meeting, defendant mentioned to plaintiff that he would be making a trip to Portland, Oregon and inquired whether plaintiff would object to defendant's speaking directly with Spaghetti Factory officials. Plaintiff stated he had no objection, but defendant did not go to Portland or initiate further contact with Spaghetti Factory officials. After the June 26 meeting, plaintiff and defendant had no further contact.

In October, 1975 plaintiff and Spaghetti Factory officials met once more to discuss locating in the Laclede's Landing area, but

during the week following the October meeting, plaintiff received a letter dated October 29, 1975 from Spaghetti Factory advising that the Levee Building would not be satisfactory for their needs and that plaintiff should expend no more time on their behalf. Plaintiff had no further communication with the Spaghetti Factory.

After the May 22, 1975 meeting, when defendant first met plaintiff and Spaghetti Factory officials, he had no further contact with the latter until October 23, 1975 when Spaghetti Factory representatives unexpectedly appeared at his office to discuss rental of facilities.[1] Defendant quoted a rental price which he considered to be unreasonably excessive. The next contact by the defendant and Spaghetti Factory was December, 1975 when defendant, who was an architect, made a proposal of a restaurant design which would meet Spaghetti Factory needs. A refined plan was presented in Portland, Oregon on January 27, 1976, and on September 16, 1976, a five-plus year lease with gross rentals at $370,500 was signed by defendant and Spaghetti Factory. Although defendant had had no contact with plaintiff from the June 26, 1975 meeting, plaintiff filed this suit for commissions on August 23, 1976 after reading in a newspaper that a lease of defendant's property to Spaghetti Factory was imminent.

Count one of plaintiff's petition charges that on May 22, 1975, defendant "orally employed and retained plaintiff as the agent of . . . [defendant] to procure and negotiate on its behalf, a lease of its aforesaid land and improvements." Plaintiff sought commissions under the alleged agreement. But in his deposition, plaintiff patently conveys that he never discussed any commission at any time with anyone.[2] Plaintiff bases his claim on his past experiences with property he has managed.

Defendant filed a motion for summary judgment, and Spaghetti Factory filed a motion to dismiss the conspiracy count against it for failure to state a claim. The trial court granted both motions.

■ Plaintiff's primary argument on appeal is that when the evidence is viewed in the light most favorable to his position, there exists sufficient evidence to create a genuine issue as to whether he and defendant entered into an implied contract of agency. We hold that as a matter of law there was no evidence of an agreement by defendant to employ plaintiff as his agent.[3]

1. While visiting in Denver, Colorado in late September or early October, 1975, defendant ate dinner at a Spaghetti Factory restaurant, primarily out of curiosity as to the type of operation that was conducted, and concluded that it was not what he wanted in the Laclede's Landing area; that he preferred a more sophisticated type of culinary establishment for his building.

2. "Q. Did you have any understanding about a commission, I mean was there any conversation about a commission between you and any representative of Old Spaghetti?
   A. [Plaintiff] No.
   Q. When they came to town, what do you think their understanding was about commission?
   A. We never discussed commission and I feel quite confident they felt the commission would be paid by the lessor.
   Q. Did you have any discussion with Kimble Cohn [defendant] about a commission?
   A. I did not discuss commission at that point because we had nothing to discuss. We had no lease to work with.
   Q. Did you ever discuss a commission with him at any time?

A. The situation never arose where we had it to discuss. We had no, we had a beginning and the ingredients of a deal but we did not have a deal.
   Q. All right, how much commission are you, do you feel you're entitled to on this transaction with Old Spaghetti Factory?
   A. Based on prior experience with lease commissions and with like, for instance the shopping centers that I manage, I receive five per cent of the gross rental of the term of the lease and on most occasions on any extensions thereof, but I do not receive commission on percentage rental.
   Q. Is that what you're claiming in this case?
   A. Have to start somewhere."

3. In count I, ¶ 5 of his first amended petition plaintiff alleges that, "[o]n or about May 22, 1975, Defendant Cohn orally employed and retained Plaintiff as the agent of the aforesaid limited partnership to procure and negotiate on its behalf, a lease of its aforesaid land and improvements." As such, he pleads an express contract. In his brief, however, plaintiff argues that there was an implied rather than express contract of employment. This variance is not fatal to plaintiff's case. Summary judgment

Therefore, the summary judgment entered was proper. In so holding we are mindful that summary judgment is a drastic remedy which should be exercised with great caution. We believe, however, that this was a proper case to grant a judgment for defendant thereby relieving all parties of the delay and expense of a formal trial in which the court would ultimately be compelled to render its judgment in defendant's favor as a matter of law.

The law in this state regarding the liability of an owner of real estate to pay commission to a real estate broker for services rendered in connection with the sale or lease of his property is well established. The broker has the burden to prove that an employment relationship existed between the owner and himself and that he was the efficient or procuring cause of the sale. If both the contract and the causation are established, the broker is entitled to reasonable compensation for his services. *Smith v. Piper,* 423 S.W.2d 22 (Mo.App. 1967); *Ballentine v. Mercer,* 130 Mo.App. 605, 109 S.W. 1037 (1908). In the absence of a contract of employment between the broker and the owner, the owner is not obligated to pay a commission even if the broker was the efficient cause of a sale which is later consummated. *Windsor v. International Life Ins. Co.,* 325 Mo. 772, 29 S.W.2d 1112 (1930); *Longmire v. Diagraph-Bradley Stencil Mach. Corp.,* 176 S.W.2d 635 (Mo.App.1944); *Ballentine v. Mercer, supra.* See also Restatement (2d) of Agency § 441, comment (a). A broker who is a mere volunteer is entitled to no compensation for services gratuitously rendered.[4] A contract of employment is the essential element for recovery. *Hoover v. Whisner,* 373 S.W.2d 176 (Mo.App.1963). "The mere fact that a broker without request, but of his own volition, brings a customer to a vendor, will not of itself imply an agreement on the part of the vendor to pay for services thus thrust

upon him. Officious intermeddling in the business affairs of others, though it may produce valuable results to the interested parties, should go unrewarded." *Ballentine v. Mercer, supra* 109 S.W. at 1040. See also Restatement (2d) of Agency § 441, comment (c). Thus any information or leads furnished by a volunteer broker, not employed by the owner, may be utilized by the owner without incurring liability for commission. *Windsor v. International Life Ins. Co., supra.*

To establish the agency contract, it must appear that the owner authorized the broker to produce a buyer or lessee and that the broker agreed to do so under such circumstances that the owner had reason to know that the broker's services were not offered gratuitously but were undertaken with an expectation of compensation. *Smith v. Piper, supra.* The contract of employment may be express or implied, but its existence must be established before a broker may enforce his claim for compensation. *Windsor v. International Life Ins. Co., supra; Hoover v. Whisner, supra; A. J. Meyer & Co. v. Schulte,* 189 S.W.2d 183 (Mo. App.1945). It is essential that there be an actual meeting of the minds of the parties involved that they knowingly and understandingly enter into mutually enforceable obligations. *Windsor v. International Life Ins. Co., supra.* Whether the agreement reached is termed express or implied has no substantive effect but merely refers to the evidence by which the agreement is shown. Where the direct words of the parties—either oral or written—acknowledge their agreement, the contract is express. Where, however, the contract is inferred from the acts and conduct of the parties, in light of the subject matter and surrounding circumstances, it is implied. *Kosher Zion Sausage Co. v. Roodman's Inc.,* 442 S.W.2d 543 (Mo. App.1969).

may not be entered if there is any theory within the scope of the pleadings or within the broad scope of the provable evidence as revealed by the affidavits, depositions and admissions which, if believed, would support recovery for the nonmoving party. *Stanturf v. Sipes, supra.*

4. A volunteer has been defined as one who proceeds without an express or implied contract. *Smith v. Piper, supra.*

Although plaintiff has pleaded an express contract the record is destitute of evidence of an oral or written agency agreement between him and defendant. Nor is there evidence of an implied agency contract—the theory plaintiff adopts in his brief on appeal. In order to raise an implied contract, the services rendered by the broker must have been performed under such circumstances that the recipient had reason to know that they were not offered gratuitously nor performed for some other person but with the expectation of compensation from the recipient. Further, the services rendered must have been beneficial to the person sought to be held liable. *Hoover v. Whisner,* supra; *Bennett v. Adams,* 362 S.W.2d 277 (Mo.App.1962). Where a broker approaches an owner and negotiates for the sale or lease of his property, no promise to pay for the broker's voluntary services will be implied if the owner is justified under the circumstances in presuming that the broker represents the prospective purchaser or lessee. *Windsor v. International Life Ins. Co.,* supra.

Under the circumstances of this case there is no showing that defendant did or reasonably could have anticipated that plaintiff was performing services exclusively for him with the expectation of compensation therefor. Plaintiff accompanied representatives of Spaghetti Factory into defendant's office voluntarily and without invitation. Although plaintiff introduced himself as a real estate broker, he and defendant had not previously met, and there was no prior arrangement by which plaintiff, or his real estate firm, had authority to solicit potential tenants on defendant's behalf. A formal listing agreement was never discussed nor did plaintiff ever broach the subject of commissions for his services. Plaintiff was without investiture to serve defendant in any capacity. He is fain to collect a substantial commission solely on the basis that he, without request, introduced defendant to parties with whom defendant subsequently negotiated a lease—an insuperable challenge. To recover, a broker must do more. "It is important, of course, that an owner of property

be not permitted to profit by the labors of others in procuring, at the owner's request, a purchaser for his property, but it is equally important that such others be not permitted to make themselves agents by volunteering to act for the owner without procuring authority, either express or implied, from the owner for that purpose." *A. J. Meyer & Co. v. Schulte,* supra at 190.

Plaintiff's theory of recovery based on the affidavits of his fellow real estate brokers—to the effect that the custom in the real estate industry in the St. Louis area is that when a real estate broker is "involved" in the sale or lease of property, the vendor is the party responsible for all real estate commissions—is unavailing to him and is dissonant with the prevailing law. A custom which is contrary to established principles of law will not be given recognition. The effect of a custom upon contractual obligations is dependent upon the existence of an actual contract between the parties. A custom is not a substitute for a contract; thus, it may not be invoked to create a contract where none exists. *Leonard v. Dougherty,* 221 Mo.App. 1056, 296 S.W. 263 (1927); *Piper v. Allen,* 219 S.W. 98 (Mo.App.1920). Unless a valid contract is first shown, any evidence relating to custom or usage is immaterial and irrelevant to establish contract liability. 21 Am. Jur.2d Customs and Usages § 21 (1965). We have previously held that no contract of agency existed between plaintiff and defendant. The evidence of custom cannot counteract this fatal defect.

Holding as we do on the issue of the propriety of the summary judgment, we must also sustain the judgment of the court dismissing plaintiff's count against the Spaghetti Factory.

The judgment is affirmed.

WEIER and KELLY, JJ., concur.