Thomas FRANCIS and Eugene D. Ruth, Doing Business as Francis & Ruth, Plaintiffs-Respondents,

v.

ST. LOUIS COUNTY WATER COMPANY, Defendant-Appellant.

No. 46475.

Supreme Court of Missouri,

Division No. 2.

Feb. 9, 1959.

Motion for Rehearing or to Transfer to Court En Banc Denied April 13, 1959.

Doris J. Banta, St. Louis, for appellant. Carter, Bull & Baer, St. Louis, of counsel.

Grand, Peper, Martin & Roudebush, Harold C. Gaebe, Jr., St. Louis, for respondents.

BARRETT, Commissioner.

On August 6, 1954, the St. Louis County Water Company sold its office building at 6600 Delmar Boulevard to its then tenant, Sam Iaconetti, for the sum of $175,000. Mr. Iaconetti paid $25,000 on the purchase price and gave the company a note in the sum of $150,000 secured by a deed of trust on the property. The plaintiffs, Francis and Ruth, a real estate firm, claiming to have been the agents in the sale of the property instituted this suit against the company to recover a broker's commission of $8,750. Upon the trial of the cause a jury returned a verdict in favor of the defendant. The trial court was of the view that instruction 4, given at the request of the defendant, was erroneous and for that reason granted the plaintiffs a new trial and the defendant has appealed. The defendant contends that the court erroneously granted a new trial because of instruction 4 and in any event that the court erred in not sustaining its motions for a directed verdict for the reason that upon this record the plaintiffs were not entitled to a commission from the defendant.

In contending that instruction 4 was not misleading the defendant says that it was directed primarily to the question of

whether the plaintiffs were volunteers, a subject upon which it says the court was bound to instruct. The defendant concedes, had the instruction cryptically told the jury to find for it if they found "no contract either express or implied" had been entered into, that it might have been too abstract and the submission one of a question of law. It is urged, however, that the instruction is a correct statement of the law, that it was not erroneously abstract and that it was directed to whether the plaintiffs were volunteers. The instruction, in substance, told the jury to find a verdict for the defendant if they found that the services of the plaintiffs "were purely voluntary *and* were not rendered by them in pursuance of *any contract* with the St. Louis Water Company, *either express or implied.*" The conjunctive submission rules, frequently applied in negligence cases, are invoked and it is said that the submission of "purely voluntary" *and* that they did not act "in pursuance of any contract" was a conjunctive submission and the assumption of an unnecessary burden on the part of the defendant in no wise harmful to the plaintiffs. The negligence cases may analogously illustrate general rules but they are not particularly helpful in view of the innumerable cases involving instructions in real estate brokers' cases. The general rules, of course, apply to broker's suits for commissions but the instructions in those suits must be specifically applicable to the basic issues and they must not be unduly confusing and misleading. 12 C.J.S. Brokers § 119, p. 307. Even in the negligence cases incursions and inroads have been made in the conjunctive submission doctrine when the conjunctively submitted matter is erroneous as a matter of law, unfairly emphasized the issue, or is confusing and misleading. Harbourn v. Katz Drug Co., Mo., 318 S.W.2d 226; Fitzpatrick v. St. L.-S. F. Ry. Co., Mo., 300 S.W.2d 490; Wilson v. Kansas City Public Service Co., Mo., 291 S.W.2d 110.

In contending that the instruction is not too abstract, that it is a correct statement of the law and that it was not misleading the appellant has ignored the force of the fact that the trial court has considered the instruction and found it to be erroneous and for that specific reason has granted the plaintiff a new trial. As a matter of course the defendant had the right, if there was evidence to support the theory, to submit the issue of whether the plaintiffs were volunteers or officious intermeddlers and therefore not entitled to a broker's commission. Ballentine & Boone v. Mercer, 130 Mo.App. 605, 109 S.W. 1037. And as a matter of fact there is no difference in legal effect between an express contract and an implied contract; if there was a contract it was of course an express contract whether the agreement was in writing, verbal or an inference from the acts and conduct of the parties. The distinction lies in the manner of manifesting mutual assent. Bailey v. Interstate Airmotive, Inc., 358 Mo. 1121, 1132, 219 S.W.2d 333, 338, 8 A.L.R. 2d 710; 1 Corbin Contracts, Sec. 18, p. 33; 1 Williston, Contracts, Sec. 3, p. 8. So, abstractly, the instruction in submitting "any contract * * * express or implied" may be a correct general statement of the law of contracts and from that point of view is not abstractly erroneous. To illustrate, in Miller v. Gotsman, Mo.App., 253 S.W.2d 407, the plaintiff's evidence established an express contract and in connection with his principal instruction the court gave an instruction which told the jury that the law did not require that "there be a written contract between plaintiff and defendants but rather the law requires that defendants authorized plaintiff expressly or impliedly, either orally or in writing or by their conduct, to offer defendants' apartment building for sale * * *." The defendant contended that the instruction constituted an erroneous submission of an implied contract but since the instruction did not direct a verdict and was truly abstract the court held that it was designed to show that the plaintiff was not required "to *prove* that the express contract, submitted under Instruction 1, was *in writing*" and so was not

erroneous. The difficulty with the instruction from this point of view arises upon the theory upon which the case was tried by the parties and the basic issues involved in the trial of the case. Hence the instruction may not be considered abstractly, it must be considered in the context of the trial and this record. In the pleadings, in the instruction; throughout the trial, and in their briefs here the parties have not observed these basic principles in the law of contracts; they have employed the word "contract," particularly the terms "implied contract" and "express contract" in some informal, conventional or colloquial sense. In their briefs the parties have indiscriminately cited cases involving written contracts, oral contracts, contracts established circumstantially as an inference from the acts and conduct of the parties as well as quasi-contract cases, actions in quantum meruit to recover the reasonable value of services.

■ It is not necessary to quote the pleadings and the instructions in detail. The defendant, throughout, has denied that there was a contract of "any kind" and upon this appeal makes the point that the plaintiffs failed to prove that they were authorized to act as defendant's agent in selling the building. However the petition alleged that the plaintiffs were "in the employ" of the defendant, that the defendant "authorized" the plaintiffs to "undertake the task" of selling the property, furnished them with the necessary data and, at a point difficult to point out in the petition in this record (the numbered pages not being the same as in the original petition), by interlineation that the defendant "through its actions, conduct and words impliedly" agreed or authorized the plaintiffs to sell the property. In their principal instruction the plaintiffs abstractly instructed the jury that "under the law when a person renders valuable services to another with such other person's knowledge and acquies(c)ence and the benefits thereof are accepted" and the services are rendered with the expectation of charging therefor and in circumstances a reasonable person would not think gratuitous "then the person benefited is required to pay the reasonable value of such services." Following this abstract statement the plaintiffs hypothesized the facts and circumstances upon which they relied as establishing their right to a commission by reason of the sale of this property to Mr. Iaconetti; and among other matters this phase of the instruction employed the language "with the knowledge, acquiescence and cooperation of the defendant." As indicated, against these theories the defendant submitted and directed a verdict if the jury found that the plaintiffs' services "were purely voluntary and were not rendered by them in pursuance of any contract * * * express or implied."

The plaintiffs did not claim that they had a written contract with the defendant and the defendant went to some pains on cross-examination of the plaintiffs to establish that there was no written contract. At one point in the cross-examination defense counsel asked this question and Mr. Ruth gave this answer: "Q. The only basis of your claim was that there was a course of action and a course of understanding between you and Mr. Weir (president of the defendant company), which implied a contract; isn't that right? A. There is no question, I think it is an implied contract and I think he did everything he could to encourage it." In just what technical sense counsel employed the term "implied contract" is not known. As stated there was no claim of a written contract and there was no proof of an explicit oral contract, if there was an "express" contract of any kind it had to come about by reason of the conduct of the parties. The essential circumstances concerning the plaintiffs' connection with the property and its sale will be detailed in another connection and perhaps that will in some measure clarify the issues and theory upon which the case was tried. As to the theory and the instruction and the trial court's granting a new trial see 3 Corbin, Contracts, Secs. 561–563, pp. 161–172.

In the context of the trial of the cause the word "express" as employed in instruction 4 may have conveyed the meaning (and requirement) to the jury that they must have found either a written or formal oral contract before they could find a verdict for the plaintiffs. So construed the instruction was confusing and misleading and in view of the precise issues involved was not a precisely accurate statement of the law and for these reasons the trial court may have granted a new trial. Miller v. Gotsman, supra, a suit on an express contract, has been previously noted. In that case it was held that a supplementary abstract instruction which did not direct a verdict was not erroneous and did not improperly submit an implied contract by employing the words "expressly or impliedly," particularly when it was plainly understood that the instruction was designed to inform the jury that plaintiff need not prove that his express contract was in writing. Brief reference to other instructions in real estate broker cases may illustrate the problem involved here. A plaintiff broker may not complain of an instruction which in addition to substantive essential facts calls for the finding of an immaterial fact and assumes an unnecessary burden. Nevertheless, if such an instruction emphasizes the immaterial fact and is confusing and misleading, likely to divert the jury from the main issues, a new trial may be demanded. Brewer v. Gowin, Mo.App., 241 S.W.2d 275, 281–282. It is improper and the trial court may justly grant a plaintiff a new trial when an instruction injects a "wrong theory" into the case (Nichols v. Whitacre, 112 Mo.App. 692, 87 S.W. 594); and, conversely, it was held that a defendant was entitled to a new trial when the plaintiff relied on an express contract but submitted an unpleaded "implied contract." Bay v. Wank, 215 Mo.App. 153, 255 S.W. 324; Longmire v. Diagraph-Bradley Stencil Machine Corp., Mo.App., 176 S.W.2d 635. There is also an analogy in the suits to recover the reasonable value of services to decedents it which it has been held misleading and improper in both plaintiffs' and defendants' instructions to include the requirement and finding of an "express contract" or "an expressed or implied contract between the parties." Kingston v. Roberts, 175 Mo.App. 69, 157 S.W. 1042; Hammer v. Crawford, Mo.App., 93 S.W. 348, 350. For all these indicated reasons it may not be said that the trial court erred in granting the plaintiffs a new trial because of the possible misleading, confusing effect of instruction 4.

In contending that the plaintiffs did not prove that they were authorized to act as the defendant's agent, that if they were their authority was limited to a sale for $250,000, that they failed to prove that they were the procuring cause of the sale of the building to Mr. Iaconetti for $175,000 and that therefore the plaintiffs did not make a submissible case the defendant has set forth, analyzed and argued all the facts and circumstances in detail. The argument and analysis is forceful but in so contending the defendant emphasizes the weight and credibility of the evidence and again ignores the view that this court must necessarily take of the evidence in determining whether the plaintiff made a submissible case. Grether v. Di Franco, Mo.App., 178 S.W. 2d 469, 472; Mack v. Mohler, Mo.App., 52 S.W.2d 188, 192. The consequence is that the conflicting evidence on every issue will not be detailed, its weight and credibility will not be considered and only such circumstances will be set forth as are necessary to demonstrate that the plaintiffs made a submissible case of authority to sell for less than $250,000 and that they were the procuring cause of the sale to Mr. Iaconetti for $175,000. As indicated, whether the plaintiffs made a submissible case for the jury upon these issues is primarily a problem in indicating the permissible inferences upon this record.

For many years the water company occupied only such space in its building as was needed to carry on its operations, the balance of the space was rented to various

tenants and for twenty years or more the plaintiffs handled the leasing of the space and the collection of the rent. There was no explicit contract between the plaintiffs and the water company, the plaintiffs collected the rent, deducted the customary commission and remitted the balance to the company. As the company's business requirements increased its occupancy of space in the building increased and by 1953 there was but a single tenant, Sam Iaconetti, who operated a bar and restaurant, "The Club Varsity," in the first floor and a section of the basement. He had been there for years and had built up a successful business. He paid his rent to the plaintiffs and they deducted their commissions and remitted the balance to the company. By March or April 1953 it became apparent that the water company would require still more office space and it was decided that Mr. Iaconetti would be required to vacate the first floor and basement upon the expiration of his lease. At that time the water company not only contemplated occupancy of the entire building, it also contemplated the construction of an addition on the lots adjacent to the building.

Pursuant to these plans Mr. Weir, the president of the water company, wrote Mr. Ruth a letter in April 1953, in which he confirmed a previous telephone conversation and enclosed a formal notice for Ruth to serve on Iaconetti informing him that he would have to vacate the premises by September 1, 1953. The plaintiffs served the notice and, needless to say, Iaconetti faced with the loss of his business was frantic. If the building was to be sold the plaintiffs could readily see that he was the most likely prospect and, according to Ruth, he told the president that Iaconetti would pay "the biggest price for it." Ruth says that Mr. Weir then put a price on the building of $250,000. Mr. Weir says that he did not give Ruth this price until after he had personally talked to Iaconetti and put a price on the building of $250,000. In any event, according to the plaintiffs, they made repeated calls on Iaconetti and offered reasons why

he should buy the building and attempted to find the means by which he could finance the purchase. Iaconetti employed experts and had the property appraised, he talked to everyone he thought helpful and at one point the plaintiffs prepared an appraisal for him. This is one of the pieces of evidence upon which the defendant relies as establishing that the plaintiffs represented Iaconetti and not the water company. As the parties talked back and forth Mr. Weir furnished the plaintiffs with what he called a memorandum as to the annual expense of maintaining and operating the building. On another occasion, although this too is a disputed fact, Mr. Weir conducted the plaintiffs and an appraiser through the building.

By September 1953, the plaintiffs got Iaconetti to make an offer and accordingly they drafted a sales contract. The contract called for a price of $175,000, $40,000 in cash and $135,000 to be secured by a note and first deed of trust on the building. At the bottom of this eight-paragraph contract was this provision: "Commission shall be 5% and be paid by the seller, and be a lien on the property." After obtaining Iaconetti's signature the plaintiffs presented the contract to Mr. Weir, together with Iaconetti's earnest money check for $5,000. Mr. Weir rejected the contract giving two reasons, not enough money and the price had to be all cash. The Ruths nevertheless left the contract with Mr. Weir and in three or four days he mailed it back to them. Mr. Weir says that he only casually examined the contract and did not see the provision with respect to a 5% commission to be paid by the seller.

The plaintiffs claim that they then contacted a life insurance company and attempted to obtain a loan on the building so that Iaconetti could pay cash. Mr. Ruth admits, incidentally, that he had no direct authority from Mr. Weir to offer the property for $175,000 and he concedes that he did not put the specific question to Mr. Weir "never asked him if you could repre-

sent him"; his view of their prior dealings and of the circumstances was that he did not think it necessary to ask the direct question and Mr. Weir says that they had no conversations as to who the plaintiffs represented. In January 1954, the plaintiffs collected two weeks' rent from Iaconetti and the water company instituted an unlawful detainer suit against him. In his frantic desire to save his business Iaconetti made a trip to Detroit and unsuccessfully attempted to negotiate with the people who owned a dominating interest in the water company. And about this time, perhaps in December 1953, the water company learned that by reason of a zoning ordinance it could not construct the contemplated addition to its building and so Mr. Weir says that his idea of the value of the building changed.

Mr Weir then entered into negotiations with another real estate dealer, Mr. Rich, considering the purchase of lots at another location and the construction of an office building; eventually the lots were purchased and the company's present office building was constructed. Mr. Weir says that a part of the plan was that Mr. Rich would buy the 6600 Delmar office building and he says that he told Iaconetti that he might make a deal with Mr. Rich. The general idea was that the water company would trade its office building for the lots, using a value of $200,000 for the building. This phase of the transaction, if we understand it, was to be handled by Mr. Weir's brother-in-law who represented still another real estate firm. In these negotiations it was agreed that Iaconetti should have the building for $175,000, $40,000 to be paid in cash. But on the appointed day Iaconetti did not have the cash and did not show up and that particular deal was not consummated.

Subsequently the water company directly sold the building to Iaconetti. The price was $175,000 and while the contract called for a down payment of $40,000, the company in fact received a down payment of $25,000 and took back a note and deed of trust for the balance. The water company paid Mr. Weir's brother-in-law a commission for selling the building. Iaconetti did not pay the plaintiffs or anyone else a real estate commission.

In even this brief resume of the circumstances of the sale of the building it is not necessary to match cases and demonstrate point by point the permissible inferences of authority to act (Ham & Ham Lead & Zinc Inv. Co. v. Catherine Lead Co., 269 Mo. 654, 192 S.W. 407; Lewis v. Thompson, 231 Mo.App. 321, 96 S.W.2d 938; Ballentine & Boone v. Mercer, supra), procuring cause (Barnum v. Hutchens Metal Products, Mo., 255 S.W.2d 807; Reitz v. Oglebay, 213 Mo.App. 611, 251 S.W. 771) and the fact that their authority, the sale having been made to Iaconetti, was not limited to a price of $250,000. Annotation 46 A.L.R.2d 848, 852; 2 Mechem, Agency, Sec. 2437, p. 2023; Martin v. Mercantile Trust Co., Mo., 293 S.W.2d 319.

The plaintiffs having made a submissible case the judgment is affirmed and the cause remanded.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All concur.